**STATE of Tennessee**

v.

**Richard ODOM, a/k/a Otis Smith.**

Supreme Court of Tennessee,
at Jackson.

Nov. 12, 2003 Session.

Heard at Memphis.

May 21, 2004.

---

Robert C. Brooks, Memphis, Tennessee, for the Appellant, Richard Odom.

Michael E. Moore, Solicitor General; Mark E. Davidson, Assistant Attorney General; William L. Gibbons, District Attorney General; and Phillip Gerald Harris and Amy Weirich, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

E. RILEY ANDERSON, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and ADOLPHO A. BIRCH, JR., and JANICE M. HOLDER, JJ., joined. WILLIAM M. BARKER, J., filed a dissenting opinion.

The defendant, Richard Odom, was convicted of felony murder and sentenced to death in 1992. This Court affirmed the conviction on direct appeal but remanded the case for a new sentencing proceeding. *State v. Odom*, 928 S.W.2d 18, 21, 33 (Tenn.1996). After the new sentencing proceeding, a jury again imposed the death sentence after finding that the evidence of one aggravating circumstance, i.e., the defendant was previously convicted of one or more felonies, the statutory elements of which involved the use of violence to the person, outweighed evidence of mitigating circumstances beyond a reasonable doubt. *See* Tenn.Code Ann. § 39–13–204(i)(2) (1991). The Court of Criminal Appeals affirmed the sentence.

After the appeal was automatically docketed in this Court, *see* Tenn.Code Ann. § 39–13–206 (1991), we entered an order specifying five issues for oral argument.[1] We now hold as follows: (1) the trial court

committed reversible error by applying a 1998 amendment to Tennessee Code Annotated section 39–13–204(c) and allowing the introduction of evidence regarding the facts and circumstances of the defendant's prior felonies to support the aggravating circumstance in Tennessee Code Annotated section 39–13–204(i)(2); (2) the trial court did not err in admitting photographs of the victim in this case but did err in admitting photographs of the victim of a prior felony offense committed by the defendant; (3) the trial court did not err in denying the defendant's motion for continuance to complete psychiatric or neuropsychological testing; (4) the death sentence was not invalid based on the failure of the indictment to charge the aggravating circumstance; and (5) the issue of whether the death penalty was excessive, arbitrary, or disproportionate in this case under the mandatory provisions of Tennessee Code Annotated section 39–13–206(c)(1)(A)–(D) need not be addressed at this time. We agree with the Court of Criminal Appeals' conclusions with respect to the remaining issues and have included the relevant portions of that opinion in the appendix to this opinion. Accordingly, we reverse the judgment of the Court of Criminal Appeals and remand for re-sentencing.

**Background**

The defendant, Richard Odom, was convicted of first degree murder and sentenced to death for raping and killing seventy-seven-year-old Mina Ethel Johnson in 1991 in Memphis, Tennessee.[2] The evi-

---

1. "Prior to the setting of oral argument, the Court shall review the record and briefs and consider *all* errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument." Tenn. Sup.Ct. R. 12.2.

2. As noted above, this Court unanimously affirmed the conviction on direct appeal but

remanded for re-sentencing because the trial court erred by excluding mitigation evidence offered by the defense and by refusing to instruct the jury on non-statutory mitigating factors. *See State v. Odom*, 928 S.W.2d 18, 32 (Tenn.1996). A majority of the Court also concluded that the evidence did not support two of three aggravating circumstances found

dence presented at the re-sentencing proceeding is summarized as follows.

### Prosecution's Evidence

On May 10, 1991, Mina Ethel Johnson's body was found on the back seat floorboard of her car in a parking garage in Memphis, Tennessee. The victim's lower body had been left exposed, and she was bleeding from her anus and vagina. There were multiple stab wounds in the victim's back and two bloody hand prints on her hips.

Sergeant Ronnie McWilliams of the Memphis Police Department testified that fingerprints found in the victim's car led to Odom's arrest on May 13, 1991. A search revealed that Odom was in possession of a "large knife," which he kept under his shirt. Odom initially told officers that his name was "Otis Smith" and that he had been imprisoned in Mississippi for a murder that occurred in 1978. Odom confessed that he intended to steal the victim's purse and forced her into the back seat of her vehicle. When the victim said, "What are you doing, son," Odom replied, "I'll give you your damn son." Odom admitted that he raped the victim and that the victim told him that she "never had sex with a man before." Odom admitted that the knife officers found in his possession was the knife he used to stab the victim. He did not recall how many times he stabbed the victim. Odom said that he found no money in the victim's wallet or purse, and that he left the victim in her car and fled. McWilliams testified that the defendant was "open" and "kind of bragging a little bit about the situation."

Dr. Jerry Francisco, who performed an autopsy on the victim, testified that the victim bled to death from a stab wound to the right ventricle of her heart. The victim also had stab wounds to her liver and right lung and two defensive wounds to her right hand. The victim suffered tears to the posterior part of her vagina, which were caused by a traumatic event such as attempted penetration, and sperm was found in her vagina. Dr. Francisco testified that the injuries were inflicted while the victim was alive, that the wounds would not have caused instant death, and that the wounds would have caused immediate pain.

John Sullivan, a family friend, testified that Mina Ethel Johnson was a "shy, genteel" woman who had never married or had children and who was capable of managing her own affairs. Louise Long, the victim's sister, testified that the victim was retired from her job as secretary at an insurance company and was active in her church. She testified that the victim had broken her foot and was going to the doctor when she was killed. Long also stated that she missed the victim because she no longer had "any family at all to go to."

In addition to the evidence regarding this offense, the prosecution presented evidence regarding the facts of the defendant's two prior violent felony convictions to support the aggravating circumstance it relied upon to seek the death penalty. *See* Tenn.Code Ann. § 39–13–204(i)(2) (prior convictions for felony offenses whose statutory elements involved violence to a person). The prior felony convictions included a 1992 robbery conviction in Shelby County, Tennessee, and a 1998 first degree murder conviction based on events that occurred in 1978 in Rankin County, Mississippi, when the defendant was seventeen years old.

With regard to the 1992 robbery conviction, the prosecution presented the testi-

by the jury. *Id.* at 26–27 (Anderson, C.J., and Drowota, J., dissenting).

mony of the victim, Lillian Hammond. Hammond testified that on May 8, 1991, she was approached by the defendant outside of her office at Shelby State Community College in Memphis, Tennessee. The defendant demanded Hammond's purse and threatened to kill or harm Hammond if she made any noise. Hammond testified that the defendant made vulgar sexual comments and said, "I want you." The defendant grabbed Hammond's arm and caused her to fall to the ground. He took Hammond's purse and ran away.

With regard to the 1998 first degree murder conviction, the prosecution presented evidence that the defendant killed the victim, Mary Rebecca Roberts, on May 4, 1978.[3] Terri Roberts, the victim's daughter, testified that her parents owned a drive-in theater in Pearl, Mississippi, and lived in a trailer next to the theater.

A police officer, Ernest Simmons, testified that he was called to the Roberts' trailer and discovered the body of Mary Rebecca Roberts slumped in a recliner. The victim was covered in blood and had gunshot wounds to her face. The recliner apparently had been moved some nine feet from the wall and placed directly in front of the door. Two knives and bullet casings were found in the trailer. A bloody hand towel and a "stainless steel Army mess-kit knife" also were found in the trailer; the knife blade was bent at "a 90 degree angle." There were bloodstains in the trailer and at the drive-in where a safe was kept. Simmons testified that the murder weapon was a .22 caliber bolt action rifle that required reloading between shots.

According to Simmons, the police later questioned the defendant, then seventeen, who told officers that he went to the trailer because he was owed money. When Rob-

erts tried to hit him with a flower pot, the defendant hit her and chased her to a bedroom. The defendant then stabbed the victim with a knife and forced her to leave her trailer and open a safe at the drive-in from which he took $255 and two guns. The defendant told police officers that he and the victim returned to the trailer and that he "sat her down" in a recliner. When Roberts pleaded for her life, the defendant told her, "Shut up. I'm trying to think." The defendant claimed that the victim was shot when she grabbed the barrel of the gun he was holding. The defendant admitted, however, that he shot the victim a second time because he "was scared" and "wanted to make sure she was dead." The defendant also admitted that he threw one of the guns into a swamp and hid the other gun and some of the money. Simmons testified that the defendant "showed no remorse" and had been "extraordinarily calm" when he gave his statement to police.

Dr. George Sturgis, who performed the autopsy, testified that Roberts had a fatal gunshot wound to her left eye, a fatal gunshot wound to the right side of her forehead, and a critical stab wound in her chest that had penetrated her left lung. The gunshot to the victim's forehead had been fired from close range. Dr. Sturgis also testified that the victim suffered lacerations and puncture wounds to her neck and chest, as well as bruises to her neck that suggested strangulation.

An assistant attorney general testified that the defendant had shown no remorse during the trial in 1998, and that the defendant exhibited an attitude as if it "was somewhat of a game." The prosecutor also testified that she saw no indication

---

**3.** The defendant pleaded guilty to this offense in 1978 and received a life sentence. After filing a successful petition for writ of habeas corpus in federal district court, the defendant was retried and again convicted in 1998.

that the defendant was suffering from any mental illness.

### Defense Evidence

The defendant presented several witnesses in mitigation at the re-sentencing proceeding. Gloria Shettles Johnson, a private investigator who assists attorneys with capital cases, testified that she obtained childhood records, conducted interviews, and prepared a social history that included the following information.

The defendant was born on August 13, 1960, in Mississippi. His parents had married when the father was eighteen and the mother was fifteen. The defendant had an older sister and a younger sister. The defendant was often left in day care for days at a time. The defendant's father drank heavily, and his mother did not take care of the children. The defendant's parents gave him up for adoption when he was two and a half; he never again saw his mother and had only a brief encounter with his father at the age of thirteen.

According to Johnson, the defendant was adopted by Jimmy and Shirley Odom in 1963. Although Jimmy Odom was very "stern" and "loud," he was not physically abusive. About one year after the adoption, however, the Odoms divorced and Shirley Odom married Marvin Bruce. Bruce was "cruel to the children." He sexually abused the defendant and his step-brother and threatened to kill them if they told anyone. Bruce put hot sauce on the defendant's food and also put hot sauce directly in the defendant's mouth whenever the defendant asked for food. Bruce also berated the defendant into his teens for bed wetting on a regular basis. The defendant suffered from frequent episodes of sleep-walking; on one occasion, he urinated in the refrigerator while sleep-walking, and on several occasions, he urinated in a car.

At age twelve, the defendant began a pattern of delinquent behavior and running away from home. At age thirteen, the defendant was charged with larceny in the juvenile system and was institutionalized at the Columbia Training School. A psychologist at the institution diagnosed the defendant as schizoid and determined that he was "incorrigible," "brain damaged," and "not fit for society at age thirteen." At age fifteen, a psychologist conducted another evaluation and found that the defendant was "destined" to spend his life in institutions. At age sixteen, the defendant was released into the community on supervised juvenile parole. At age seventeen, the defendant murdered Mary Rebecca Roberts.

Johnson testified that one of the defendant's adoptive brothers, Larry Odom, had a criminal record and had served ten years in prison. Johnson was unable to verify whether a second adoptive brother, Jimmy Odom, had a record. Johnson acknowledged, however, that others who had grown up under the dominion and control of Marvin Bruce had not committed murder.

Johnson further testified that the defendant had earned a correspondence paralegal degree while in prison and had scored between 90 and 100% in several areas of the law. While imprisoned for the Mississippi murder of Mary Rebecca Roberts, the defendant's behavior was good enough to be transferred to a county jail where he was a cook and was elevated to "trustee" status. Johnson conceded that the defendant had been able to accomplish these things despite the 1974 psychological report that he was "brain damaged."

Dr. Dennis Earl Schmidt, a neuropharmacologist, testified that he, Dr. Steven Paul Rossby, and Dr. Benjamin Johnson visited the defendant in prison in 1999 to

perform a court-ordered spinal tap. Dr. Schmidt later analyzed samples of the defendant's spinal fluid by using "high-performance liquid chromatography," and he testified that the test revealed the defendant had only about half the normal level of serotonin. He further explained that the level of serotonin found in the spinal column is directly indicative of serotonin function in the brain.

Dr. Rossby, a molecular neurobiologist, testified that Dr. Schmidt's test results indicated that the defendant's serotonin level was "severely, extremely abnormal" and the lowest level ever seen at his lab. Citing studies conducted in Finland and Sweden, Dr. Rossby explained that low serotonin levels are very strongly linked to "impulsive behaviors[,] includ[ing] unrestrained aggression, violence, [and] rage." Although Dr. Rossby stated that low serotonin levels could cause a person to exhibit low self-control of impulses, he explained that "whatever impulses that are released by this low self-control depends upon the individual, depends on their birth, depends on their heredity, depends on their early childhood experiences." He testified that the victim's use of the word "son" may have "served as a trigger to release the rage that [the defendant] felt toward his mother or mother figures...."

Dr. Rossby conceded that low serotonin levels have also been associated with non-violent behaviors such as eating disorders and gambling addiction. In addition, he admitted that there were no studies conclusively linking low serotonin levels to violent behavior and that he could not state that the defendant's low serotonin level caused him to commit the murder of Mina Ethel Johnson. Although the defendant had no problems controlling impulsive rage while in prison, Dr. Rossby stated that the ability to control impulses is not tested as often in the structured environment of prison.

### Prosecution's Rebuttal Evidence

In rebuttal, the prosecution presented the testimony of Dr. John Hutson, a clinical psychologist. Although Dr. Hutson testified that he was quite impressed with Dr. Rossby's testimony as a whole, he opined that based upon the current scientific understanding of the role of serotonin, it cannot really be said "that serotonin causes anything." In addition, Dr. Hutson testified that he was not aware of any literature stating that there is a causal relationship between serotonin, violent behavior, obesity, depression, suicide, or other abnormal behaviors.

At the conclusion of the sentencing proceeding, the jury determined that the evidence of the single aggravating circumstance outweighed the evidence of mitigating circumstances beyond a reasonable doubt and sentenced the defendant to death for the felony murder of Mina Ethel Johnson. After the Court of Criminal Appeals affirmed the sentence, the case was docketed automatically before this Court.

### Analysis

#### Evidence of Prior Felony Convictions

The first issue raised by the defendant is that the trial court improperly applied a 1998 statutory amendment to Tennessee Code Annotated section 39–13–204(c).[4]

---

4. In 1998, Tennessee Code Annotated section 39–13–204(c) was amended to add the following language:

In all cases where the state relies upon the aggravating factor that the defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person, either party shall be permitted to introduce evidence concerning

The 1998 amendment allows the prosecution to prove the facts and circumstances of the two prior felonies relied upon to establish the aggravating circumstance in Tennessee Code Annotated section 39–13–204(i)(2), i.e., that the defendant had a prior conviction for a felony whose statutory elements included the use of violence to the person.

The defendant argues that the 1998 amendment was inapplicable because the offense was committed in 1991. The defendant argues that the error allowed the prosecution to rely on inadmissible evidence underlying his 1992 conviction for robbery and his 1998 conviction for first degree murder and that the error requires a new sentencing proceeding.

The State argues that the 1998 amendment is a procedural statute that was properly applied retroactively to the defendant's 1991 offense. The State asserts that even if the 1998 amendment cannot be applied retroactively, the evidence underlying the defendant's two prior violent felonies based on events in 1978 and 1991 was admissible to rebut the defendant's mitigation evidence. Finally, the State contends that if the evidence was not admissible, the error was harmless.

### Applicability of 1998 Statutory Amendment

■ We begin our analysis by reviewing the language of Tennessee Code Annotat-

ed section 39–13–204(c) as it was worded in 1991 at the time of the offense in this case:

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; *any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i);* and any evidence tending to establish or rebut any mitigating factors. Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence; provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted.

Tenn.Code Ann. § 39–13–204(c) (1991) (emphasis added).

When this pre–1998 version of the statute was applied to capital sentencing proceedings at which the State relied on the "prior violent felony" aggravating circumstance in Tennessee Code Annotated section 39–13–204(i)(2), this Court consistently held that it was "not appropriate to admit evidence regarding specific facts of the crime resulting in the previous conviction, when the conviction on its face shows that it involved violence or the threat of violence to the person." *State v. Bigbee,* 885 S.W.2d 797, 811 (Tenn.1994); *see also State v. Stout,* 46 S.W.3d 689, 701 (Tenn.

the facts and circumstances of the prior conviction. Such evidence shall not be construed to pose a danger of creating unfair prejudice, confusing the issues, or misleading the jury and shall not be subject to exclusion on the ground that the probative value of such evidence is outweighed by prejudice to either party. Such evidence shall be used by the jury in determining the weight to be accorded the aggravating factor.

1998 Tenn. Pub. Acts, ch. 915, § 1 (effective May 7, 1998). The statute also was amended in 1998 to expressly allow victim impact testimony. *See* 1998 Tenn. Pub. Acts, ch. 916, § 1. The amendment in chapter 916 does not represent a change in the law. *See State v. Carter,* 114 S.W.3d 895, 907 (Tenn.2003). Our present analysis concerns only the amendment in chapter 915.

2001). In contrast, the 1998 amendment now mandates that such evidence is admissible and must be considered in determining the weight of Tennessee Code Annotated section 39–13–204(i)(2).

The threshold question of whether the trial court committed error in applying the 1998 amendment retroactively in this case was recently resolved in *State v. Powers*, 101 S.W.3d 383 (Tenn.2003). In *Powers*, we unanimously held that a trial court erred by applying the 1998 amendment in a case where the offense occurred "before the effective date of the amendment." *Id.* at 400. We relied upon *State v. Smith*, 893 S.W.2d 908, 919 (Tenn.1994), in which this Court had held that the trial court properly instructed the jury on pre 1989 provisions of the capital sentencing statute where the offense had been committed before the enactment of the statutory provisions. The Court explained in *Smith* that Tennessee Code Annotated section 39–11–112 [5] and the principles against the retroactive application of statutes indicated that the legislature did not intend for the 1989 amendments to be applied retroactively to offenses occurring before the effective date of the amendments. 893 S.W.2d at 919.

Our decision in *Powers* was consistent not only with *Smith* but also numerous other decisions that have held that capital sentencing proceedings must be conducted in accordance with the statutory law in effect at the time the offense was committed. *See State v. Cauthern*, 967 S.W.2d 726, 731–32 (Tenn.1998) ("heinous, atro-cious or cruel" aggravating circumstance); *State v. Bush*, 942 S.W.2d 489, 505–07 (Tenn.1997) ("heinous, atrocious or cruel" aggravating circumstance); *State v. Hutchison*, 898 S.W.2d 161, 174 (Tenn. 1994) (non-statutory mitigating circumstances); *State v. Cazes*, 875 S.W.2d 253, 267 (Tenn.1994) (burden of proof and "heinous, atrocious or cruel" aggravating circumstance); *State v. Brimmer*, 876 S.W.2d 75, 82 (Tenn.1994) (burden of proof). As we clearly said in *Smith*, "a criminal offender must be sentenced pursuant to the statute in effect at the time of the offense." 893 S.W.2d at 919.

In the face of this strong precedent, the dissent describes *Powers* as "unpersuasive" and argues that the decision is distinguishable from our prior decisions.[6] We see no justification for this Court to radically depart from the guiding principle of *stare decisis* by overruling *Powers* more than one year after its release.

Rather than follow *Powers* and our controlling decisions, the dissent adopts the State's main argument that the trial court properly applied the 1998 statutory amendment after determining that it was procedural in nature and not substantive. Although the distinction between substantive and procedural law has been recognized by the courts of this state, we have not applied this distinction in capital sentencing. *Hutchison*, 898 S.W.2d at 176.[7] Moreover, we continue to reject the State's argument in the present capital case for several reasons.

---

5. Tennessee Code Annotated section 39–11–112 (2003) provides: "Whenever any penal statute or penal legislative act of the state is repealed or amended by a subsequent legislative act, any offense, as defined by the statute or act being repealed or amended, committed while such statute or act was in full force and effect shall be prosecuted under the act or statute in effect at the time of the commission of the offense."

6. These and other arguments presently expressed by the dissent were not offered in *Powers* itself.

7. Indeed, the dissent cites no criminal cases applying an exception to the rule that statutes are presumed to apply prospectively unless they are procedural or remedial in nature.

First, as we emphasized in *Brimmer*, statutes are presumed to operate prospectively unless the legislature has indicated a contrary intention. 876 S.W.2d at 82. Although the State argues that the 1998 amendment to Tennessee Code Annotated section 39–13–204(c) is merely procedural and may be applied retroactively, the plain language of the 1998 amendment does not include a retroactivity clause or any other statutory language that indicates a legislative intent for the amendment to be applied retroactively. In sum, had the legislature intended to depart from the long-established rule that statutes are presumed to apply prospectively, it could have so indicated.

Second, the 1998 amendment to Tennessee Code Annotated section 39–13–204(c) is not simply a procedural change to capital sentencing laws. The 1998 amendment directly impacts an aggravating circumstance that is "more qualitatively persuasive and objectively reliable than others" the prosecution may rely upon to seek the death penalty, i.e., the defendant's prior violent felony convictions under Tennessee Code Annotated section 39–13–204(i)(2). *State v. Howell,* 868 S.W.2d 238, 261 (Tenn.1993). Moreover, by providing that "[s]uch evidence shall not be construed to pose a danger of creating unfair prejudice, confusing the issues, or misleading the jury and shall not be subject to exclusion on the ground that the probative value of such evidence is outweighed by prejudice to either party," the 1998 amendment removes the right of the defendant to invoke the exercise of the trial judge's discretion on the issue of admissibility. Similarly, by providing that "[s]uch evidence shall be

used by the jury in determining the weight to be accorded the aggravating factor," the 1998 amendment requires the jury to consider as substantive evidence the circumstances of a prior conviction in determining the weight of the (i)(2) aggravating circumstance.[8]

■ Finally, the retroactive application of a statute in a criminal case also raises the implication of violating constitutional prohibitions against ex post facto laws. An ex post facto violation under article I, section 11 of the Tennessee Constitution occurs whenever a law (1) "provides for the infliction of punishment upon a person for an act done which, when it was committed, was innocent," (2) "aggravates a crime or makes it greater than when it was committed," (3) "changes punishment or inflicts a greater punishment than the law annexed to the crime when it was committed," (4) "changes the rules of evidence and receives (sic) less or different testimony than was required at the time of the commission of the offense in order to convict the offender," and (5) "in relation to the offense or its consequences, alters the situation of a person to his disadvantage." *Miller v. State,* 584 S.W.2d 758, 761 (Tenn. 1979) (citing *State v. Rowe,* 116 N.J.L. 48, 181 A. 706, 709–10 (1935)).

■ In our view, the application of the 1998 amendment violated article I, section 11 of the Tennessee Constitution. Unlike the statute at the time of the 1991 offense, the 1998 amendment mandated the admission of different and additional evidence underlying the defendant's violent felonies and required that the evidence be consid-

---

**8.** Given that the 1998 amendment changes the nature and the amount of evidence that may be used to establish an aggravating circumstance, mandates that the evidence be considered by the jury, and removes the trial court's traditional discretion in determining the admissibility of evidence, we disagree with the dissent's conclusion that the 1998 amendment "does nothing other than alter the method by which the jury weighs" an aggravating circumstance.

ered by the jury in weighing a critical aggravating circumstance relied upon to seek the penalty of death.[9] Additionally, the 1998 amendment and its consequences affected the capital sentence proceeding to the disadvantage of the defendant. *See Miller*, 584 S.W.2d at 761. Therefore, the 1998 amendment fits within categories four and five of *Miller*. *Id.*

The State's reliance on *State v. Pike*, 978 S.W.2d 904 (Tenn.1998), is unpersuasive. The issue in *Pike* involved the retroactive application of an amended procedural rule that simply gave an equal number of peremptory challenges to both the defendant and the State. The amended rule did not disadvantage the defendant and did not fall into any of the other ex post facto prohibitions under article I, section 11 of the Tennessee Constitution. *See Pike*, 978 S.W.2d at 926–27 (appendix).

In sum, our decision in *Powers* recognized that the 1998 amendment was not to be applied to cases occurring before its effective date. *Powers*, 101 S.W.3d at 400. Our decision was based on and consistent with our prior decisions as to the law applicable to capital sentencing hearings, the well-established principle that statutes are presumed to operate prospectively, and the prohibition of laws that violate ex post facto provisions. Accordingly, we adhere to our decision in *Powers* and related decisions and conclude that the trial court erred in applying the 1998 amendment.

*Harmless Error Analysis*

◼ Our conclusion that the trial court erred in applying the 1998 amendment to Tennessee Code Annotated section 39–13–204(c) does not end our analysis of this issue. Instead, we must determine whether the trial court's admission of evidence underlying the defendant's prior violent felony aggravating circumstance set forth in Tennessee Code Annotated section 39–13–204(i)(2) was reversible error. *Powers*, 101 S.W.3d at 401.

Prior to the 1998 amendment, this Court had consistently held that it was improper to introduce evidence regarding the facts and circumstances underlying a prior violent felony conviction being used to establish the aggravating circumstance in Tennessee Code Annotated section 39–13–204(i)(2) where the prior conviction on its face involved violence to the person. *Bigbee*, 885 S.W.2d at 812.

In *Bigbee*, the prosecution introduced the facts underlying the defendant's prior conviction for first degree murder, emphasized that the prior first degree murder involved a victim who had been shot three times, stressed that the victim had four children, argued that the jury should consider that the defendant had committed two killings, and suggested that the death penalty was appropriate because the defendant already had received a life

---

9. We disagree with the dissent's assertion that ex post facto provisions are not implicated because the 1998 amendment affected the sentence but not the conviction. First, a capital trial is a bifurcated proceeding in which the jury first determines a defendant's guilt or innocence and then, following a separate sentencing proceeding, determines the appropriate punishment. Tenn.Code Ann. § 39–13–206. *See Monge v. California*, 524 U.S. 721, 732, 118 S.Ct. 2246, 141 L.Ed.2d 615 (1998) (stating that the sentencing phase of a capital trial is "in many respects a continuation of the trial on guilt or innocence of capital murder"). Second, there is little or no justification to support a holding that the retroactive application of a statute that directly disadvantages a defendant in a sentencing proceeding that determines a sentence of life or the ultimate sentence of death does not violate ex post facto provisions.. *See State v. Guzek*, 336 Or. 424, 86 P.3d 1106, 1118 (2004) (rejecting the argument that the ex post facto prohibition does not apply to laws that affect penalty-phase proceedings).

sentence for the prior murder. *Id.* at 810. This Court remanded for a new sentencing proceeding after concluding that the inadmissible evidence and the prosecutorial argument improperly enhanced the aggravating circumstance beyond its statutory language and affected the jury's determination to the prejudice of the defendant. *Id.* at 812.[10]

Our recent decisions have emphasized, however, that not every violation of the rule in *Bigbee* requires a new sentencing hearing. In *State v. Stout,* 46 S.W.3d 689, 701 (Tenn.2001), for instance, the prosecution relied on the aggravating circumstance set forth in Tennessee Code Annotated section 39–13–204(i)(2) and presented testimony from the victim of an especially aggravated robbery committed by the defendant. In holding that the error did not affect the jury's verdict, we observed that the prosecution used the evidence to establish a separate aggravating circumstance, i.e., that the murder was committed to avoid, interfere with, or prevent a lawful arrest or prosecution. 46 S.W.3d at 701; *see also* Tenn.Code Ann. § 39–13–204(i)(6) (2003). We also noted that the prosecution did not elaborate on or emphasize the underlying facts to bolster or enhance its reliance on the prior violent felony aggravating circumstance. In short, we held that the case was distinguishable from our decision in *Bigbee* and that the error was harmless. 46 S.W.3d at 701–02; *see also*

*Powers,* 101 S.W.3d at 401 (holding that error was harmless in part because the evidence underlying the defendant's prior felonies was used to establish a separate aggravating circumstance in Tennessee Code Annotated section 39–13–204(i)(6)).

Similarly, in *State v. Chalmers,* 28 S.W.3d 913 (Tenn.2000), the prosecution relied on the defendant's convictions for especially aggravated robbery and attempted first degree murder to establish the prior violent felony aggravating circumstance under Tennessee Code Annotated section 39–13–204(i)(2) and introduced evidence to show that the two prior offenses involved a shooting that occurred shortly before the first degree murder for which the defendant faced the death penalty. *Chalmers,* 28 S.W.3d at 916. We concluded that the error was harmless because the evidence had been introduced to rebut the defendant's contention that he was not involved in the prior felonies and because the prosecutor's reliance on the underlying facts was not as egregious as in *Bigbee. Id.* at 917.

With these principles in mind, we turn to the present case. The prosecution introduced detailed evidence regarding the defendant's 1992 conviction for robbery. For example, the victim, Lillian Hammond, testified that the defendant demanded her purse and threatened to kill or harm her if she made any noise. Hammond testified that the defendant made vulgar sexual

---

10. In addition to emphasizing the facts of the prior felony, the prosecution in *Bigbee* also argued, in part:

There was nobody there ... to ask for mercy for [the victim of the prior offense], none of her children, none of her family. Nobody was there when she was shot the first time to ask for mercy for her life. There was nobody there from her family to ask for mercy when she was shot the second time....
[Y]ou can't escape the fact that [the defendant] has killed two completely innocent

human beings, never to see their families again, never afforded the opportunity to ask for mercy. Were [sic] not talking about one life, ladies and gentlemen. We're talking about two lives.

. . . .

We have got two people that are dead because of what [the defendant] did.... Two people that are dead. Seven children that are left without parents.
885 S.W.2d at 810.

comments, grabbed her arm, and took her purse.

The prosecution also introduced extensive and graphic proof regarding the defendant's 1998 first degree murder conviction, during which he shot and stabbed the victim, Mary Rebecca Roberts, in 1978 in Rankin County, Mississippi. First, the State introduced the defendant's admission that he hit Roberts, cut her with a knife, and forced her to open a safe from which he took $255 and two guns. Next, the State proved that although the defendant claimed that Roberts was first shot when she grabbed the barrel of his gun, he admitted that he shot the victim a second time because he "wanted to make sure she was dead." The prosecution then introduced evidence, including photographs of the victim, to establish that Roberts had suffered fatal gunshot wounds to her left eye and forehead and a stab wound to her left lung. Finally, the prosecution presented testimony that the defendant showed no remorse for the killing of Roberts.

In our view, the improperly admitted evidence is strikingly similar to that in *Bigbee*. In both *Bigbee* and this case, the prosecution introduced the details of a prior first degree murder committed by the defendant. *Bigbee*, 885 S.W.2d at 802. Indeed, the nature and extent of the inadmissible evidence in this case was even more graphic and detailed than that in *Bigbee*. Moreover, the improperly admitted evidence in this case was substantially more prejudicial than the prior felonies in the cases in which we held that the error did not affect the jury's verdict. *See Powers*, 101 S.W.3d at 400–01 (prior convictions for three aggravated assaults and a robbery); *see also Stout*, 46 S.W.3d at 702 (prior conviction for especially aggravated robbery); *Chalmers*, 28 S.W.3d at 916 (prior convictions for especially aggravated robbery and attempted first degree murder).

In addition, this case is identical to *Bigbee* in that the prosecution relied heavily in closing argument on the facts underlying the defendant's prior felony convictions to enhance the effect of this aggravating circumstance. Indeed, the record is replete with the prosecution's repeated emphasis in argument on the facts underlying the prior conviction. For instance:

It wasn't enough for that killer to have taken Terri Roberts' mother from her when she was seventeen years old—

. . . .

Did he care at all about Mina Ethel Johnson? About Rebecca Roberts? About Lillian Hammond? About the lives that he destroyed? Not for a minute.

You heard testimony that on May 4th [sic], 1978, Rebecca Roberts was found dead in her trailer. You saw the pictures. You heard Detective Simmons talk to you about the investigation. You heard Dr. Sturgis talk to you about the autopsy that he performed.

This is what was left of Becky Roberts. They want you to ignore all of this; to ignore the facts, to ignore the evidence, to put your common sense away, and to feel sorry for this vicious killer, who laughingly displayed Becky Roberts for the whole world to see—

. . . .

Two families lost love ones at his vicious[,] calculating, manipulative hands. Lillian Hammond was robbed. Scared out of her mind, emotionally harmed. You heard her testify.

The prosecution placed particular emphasis on the graphic evidence underlying the 1978 murder:

And when Detective Simmons and the other officers found Becky Roberts, the

chair was pulled right up to the door, so that the first thing you'd see was his handiwork, the work of his vicious, manipulative hands.

. . . .

Going to a woman's trailer because her husband owes you money, stabbing her with a knife until the blade bends to a ninety-degree angle, and then forcing her to the sink where you wash her up, get her cleaned up so you can walk her over to the safe, some thirty yards away, all the time she's dripping blood, dripping blood, dripping blood; making her open the safe, get the money out, walk her back thirty yards to her home, sit her in a chair, and she's begging, she's pleading with you, "Please don't shoot me, please don't shoot me, I won't tell anybody it's you; I'll tell them it's somebody else. I'll make up a name."

Similarly:

It wasn't enough for this cold, violent, manipulative, calculating killer—... to walk Ms. Roberts back to the trailer and just leave her. He had gotten the money. He roughed her up. He hurt her. He stabbed her. No. No. He shot her. He shot her in the head. You saw the picture, ladies and gentlemen. You heard Dr. Sturgis tell you about the two bullets that went into her head, basically forming an X. One went one way and one went the other.

Why did you shoot her, Mr. Cold-violent-manipulative killer? "Because I wanted to make sure she was dead. I wanted to make sure she was dead."

Impulse? Impulse, ladies and gentlemen? No way.

Planned out, thought out. Even in the end when [Roberts] was there in the chair bleeding to death, again, alone in her home, he's still manipulating the scene. He's still controlling the environment. He pulls the chair out and puts

her on display, just like you would mount a trophy on your mantle. A notch in his belt.

Yet another example:

Stabbing a woman to gain control over her, cleaning her up, walking her thirty yards, forcing her to open a safe, walking her back another thirty yards, setting her in a chair and telling her to shut up so I can think while she is pleading for her life is not impulse.... That's cold, manipulative violence that ended in the death of Becky Roberts.

. . . .

You heard the testimony of the murder of Becky Roberts. Of the violent, ugly, horrific manner in which she died. Her eye was shot out. Two bullets formed an X in her brain. It appeared she had been straggled [sic]. The trailer was torn apart, blood everywhere. There's blood back in the bedroom, and there's blood in the living room. Impulse?

Finally, in concluding the argument, the prosecution again emphasized the detailed facts underlying the prior convictions:

The crime you heard and saw is: "He stood over me when I was on the ground. He had his hand inside here and he made sexually abusive comments to me." That's what [Hammond] said.

. . . .

Look at Ms. Roberts. Look at how she died. Look at why she died. Richard Odom said she died because she knew him, and he didn't want to get caught. Isn't that sad. But what weight should you give it?

You know that you're dealing with an offender, a person, who ... did this for personal gain and displayed her. It is a reasonable inference to draw that he displayed [Roberts'] body for the next person to see. It is a reasonable infer-

ence that he alone would have had reason to have drawn that chair out nine feet from the wall. Why was that done? Why was that done? That gives you an insight into him. That gives you an insight into who the real Richard Odom is. . . .

With the record replete with these and other examples of its reliance on the improper evidence, the State's argument on appeal that the evidence and arguments were proper to rebut the defendant's mitigating evidence is not persuasive.[11] First, the argument is dubious because the evidence was presented in the prosecution's case-in-chief when there was no mitigating evidence to rebut. Second, the nature and extent of the evidence presented by the prosecution demonstrates that it was not presented for the sole purpose of rebutting mitigating evidence. Indeed, the prosecution presented an overwhelming amount of evidence that included the victim's testimony regarding the defendant's 1992 robbery, the defendant's first degree murder of Rebecca Roberts, the defendant's statements, the nature and manner of the Roberts killing, the appearance of the Roberts crime scene, including a photograph of the victim, and the details of the autopsy. Finally, the prosecution's arguments as related above went far beyond a legitimate or reasoned effort to rebut mitigating factors and instead enhanced the only aggravating circumstance by including the extensive facts and details of the underlying felonies.

Accordingly, the trial court's erroneous application of the 1998 amendment led directly to the prosecution's introduction of detailed and graphic evidence of prior violent felonies committed by the defendant.

The law as it existed at the time of the offense prohibited such evidence. Moreover, the prosecution heavily relied upon the inadmissible evidence underlying the defendant's prior felonies in arguing that the jury should impose the death penalty for the defendant's offense in this case. In short, under these circumstances, as in *Bigbee*, we conclude that the error affected the verdict. *See Bigbee*, 885 S.W.2d at 812. We therefore remand for a new sentencing proceeding to be conducted in accordance with the law as it existed at the time of the offense.

### Admissibility of Photographs

■ The defendant next argues that the trial court committed reversible error by allowing the prosecution to introduce photographs of the victim in this case, Mina Ethel Johnson, as well as a photograph of the victim of the 1978 first degree murder committed in Mississippi, Mary Rebecca Roberts. The defendant argues that the probative value of the photographs was substantially outweighed by the danger of unfair prejudice.

The State argues that the photographs of Johnson were relevant to show the position of her body, the location of the offense, and the nature of the defendant's actions in committing this offense. Similarly, the State argues that the photograph of Roberts showed the defendant's conduct in the 1978 first degree murder offense and rebutted the defendant's contention that his actions were impulsive.

■ At a re-sentencing hearing, both the State and the defendant are entitled to offer evidence relating to the circumstances of the crime. *State v. Teague*, 680

---

11. The State's alternative argument was that the defendant waived the issue for failing to object to the admission of the evidence. The trial court, however, had ruled that the evidence was admissible prior to trial; thus, the

defendant has not waived the issue by failing to object contemporaneously with the admission of the evidence in the prosecution's case-in-chief.

S.W.2d 785, 787–88 (Tenn.1984). A trial court is afforded broad discretion in determining whether to admit photographs of the deceased in a murder prosecution. *See State v. Morris,* 24 S.W.3d 788, 810–11 (appendix) (Tenn.2000). The decision to admit photographs will be reversed only if the trial court has abused its discretion. *State v. Vann,* 976 S.W.2d 93, 103 (Tenn. 1998).

At the time of this offense, Tennessee Code Annotated section 39–13–204(c) stated in part that evidence may be presented in a capital sentencing proceeding as to "any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime. . . ." The statute further provided that "[a]ny such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence. . . ." *Id.*

In applying these principles, we agree with the Court of Criminal Appeals that the trial court did not abuse its discretion in admitting the two photographs of Johnson. The first photograph, which was three-by-five inches in size, showed the victim in the back seat floorboard of her car and the multiple stab wounds and bleeding she suffered. The second photograph, which was also three-by-five inches in size, showed the victim on the floorboard with her head facing the rear of the car and a rolled up check in her hand. In sum, the photographs were relevant for the prosecution to show the "nature and circumstances" of the crime, i.e., the position of the victim's body, the location of the offense, the defendant's actions, and the injuries suffered by the victim. Moreover, the photographs were not unfairly prejudicial to the defendant.

■ We disagree, however, with the Court of Criminal Appeals' conclusion that the trial court properly admitted the photograph of the victim of the first degree murder in Mississippi. As we have discussed, the trial court admitted the underlying facts and circumstances of the defendant's prior felonies based on its erroneous retroactive application of the 1998 amendment to Tennessee Code Annotated section 39–13–204(c). Because the photograph of the victim was intertwined with the inadmissible evidence regarding the facts and circumstances of the prior first degree murder, it follows that its admission was improper under the law applicable to this case. *See Bigbee,* 885 S.W.2d at 811–12.

Moreover, although the State argues that the photograph was properly admitted to rebut the mitigating evidence, we note once more that it was introduced during the State's case-in-chief and not during the State's rebuttal. The trial court's finding that the photograph showed that the defendant's killing of Roberts was "methodical" or otherwise necessary to rebut the mitigating evidence was not supported by the record. Instead, the photograph, which shows the victim's body slumped over in a recliner and the wounds suffered by the victim, was of minimal probative value for purposes of sentencing. Accordingly, we hold that the trial court abused its discretion by allowing the admission of the photograph of the victim of the prior offense.

### Continuance

■ The defendant next argues that the trial court abused its discretion by refusing to grant a continuance to allow psychiatric and neuropsychological evaluations and that the trial court's ruling violated his rights to due process and effective counsel under the United States and Tennessee Constitutions. *See* U.S. Const. amend. VI, XIV; Tenn. Const. art. I, §§ 8,

9, 17. The State maintains that the trial court properly refused to grant a continuance from its scheduled date of September 27, 1999.

The trial court's denial of a continuance will be reversed only if it appears that the trial court abused its discretion to the prejudice of the defendant. *State v. Hines,* 919 S.W.2d 573, 579 (Tenn. 1995). An abuse of discretion requires a showing that the denial of a continuance denied the defendant a fair trial or that the result of the trial would have been different. *Id.; see also State v. Mann,* 959 S.W.2d 503, 524 (appendix) (Tenn.1997). Moreover, a defendant who asserts that the denial of a continuance constitutes a denial of due process or the right to counsel must establish actual prejudice. *See Morris v. Slappy,* 461 U.S. 1, 11–12, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983).

The trial court's written order denying the continuance reflects as follows.[12] The re-sentencing proceeding was first set for January of 1997 but was continued in December of 1996 in part because the defense requested additional time to find a mitigation expert. More than a year later, in January and February of 1998, the defense filed an ex parte request for a mitigation specialist and a psychologist. The trial court granted funds for the mitigation expert but denied funds for a psychologist until the defense made a particularized showing of need. After several hearings in 1998 to determine the status of the proceedings, the re-sentencing hearing was delayed until after the defendant was re-tried and convicted in July of 1998 of the first degree murder in Mississippi.

In November of 1998, the trial court set the re-sentencing hearing for May 10, 1999. In March of 1999—two months before the hearing—defense counsel moved for a continuance on the ground that the defendant's mitigation expert had not completed her investigation. The trial court granted the motion over the prosecution's objection and set the re-sentencing for September 27, 1999. In April of 1999, the trial court granted the defendant's motion for a psychiatric evaluation by Dr. William D. Kenner.

On September 14, 1999, the defendant filed an ex parte motion requesting that the defendant undergo a neuropsychological evaluation by Dr. Pamela Auble and requesting a continuance so that the evaluation could be conducted on November 1, 1999. Although Dr. Auble's evaluation was requested so that Dr. Kenner could complete his psychiatric examination, the trial court denied the motion because Dr. Auble's evaluation was scheduled to take place after the date of the re-sentencing proceeding. The trial court also denied a continuance.

On September 16, 1999, the trial court entered an ex parte order authorizing a neuropsychological evaluation of the defendant by Dr. Alison Kirk. However, on September 22, 1999, i.e., five days before the scheduled re-sentencing, the defense sought a continuance because Dr. Kirk had determined she lacked sufficient forensic experience to conduct the evaluation. The motion was accompanied by an affidavit from Dr. Kenner asserting that he could not work on the defendant's case unless a neuropsychological evaluation was completed. After finding that the defense had not demonstrated that the defendant had a mental illness or defect that would be used in mitigation, the trial court denied the continuance.

12. The complex and lengthy chronology of events is fully and accurately set forth in the Court of Criminal Appeals' opinion, which is attached as an appendix to this decision.

On September 23, 1999, the defendant filed an ex parte motion requesting funds for Dr. Kenner to travel to Memphis to testify. The motion asserted that Dr. Kenner had examined the defendant for 2.5 hours and had reviewed the defendant's records for 7.5 hours. Although the trial court authorized the funds, the defense later moved to continue the re-sentencing proceeding on the basis that Dr. Kenner refused to testify unless a neuropsychological evaluation was completed. The trial court offered to compel Dr. Kenner to attend the trial, but the defense declined. The trial court then denied a continuance.

After setting forth the above chronology and findings, the trial court's written order concluded, in part, that defense counsel "have been given more than enough time to prepare a mitigation defense" and that the period of time was "much more than sufficient to have prepared any mitigation defense, no matter how involved, intricate or complex." The trial court further concluded:

> This Court has done everything in its power to allow the defendant to produce every bit of proof he could muster in his re-sentencing, allowing many continuances over a period of two years and eight months from the first re-sentencing hearing set ... and has allowed funds for numerous experts.... To have permitted yet another continuance to conduct last minute exploratory examinations, for which no basis had been shown in the record, at the last minute ... would have been in this Court's opinion extremely improper and would be a gross abuse of the judicial process.

After reviewing the record and the trial court's findings, we fully agree with the Court of Criminal Appeals' conclusion that the trial court's refusal to continue the proceeding from the date of September 27, 1999, was not arbitrary, unreasonable, or an abuse of discretion. Moreover, we agree with the Court of Criminal Appeals' conclusion that the defendant completely failed to demonstrate that the findings or testimony of Dr. Kenner or Dr. Auble would have been favorable to the defense. In short, the defendant has failed to establish that the trial court abused its discretion because there is no indication that he was denied a fair trial or that the result of the proceeding would have been different had a continuance been granted. Accordingly, the defendant is not entitled to relief on this issue.

### Sufficiency of Indictment

■ The defendant contends that his death sentence is invalid because the indictment failed to charge the aggravating circumstance which distinguished this capital first degree murder from a non-capital first degree murder. The defendant, citing *Apprendi v. New Jersey,* argues that the Fifth and Sixth Amendments require that "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Apprendi v. New Jersey,* 530 U.S. 466, 476, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); *see also Ring v. Arizona,* 536 U.S. 584, 602, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

In *State v. Holton,* 126 S.W.3d 845 (Tenn.2004), we recently explained that "*Apprendi* applies only to enhancement factors used to impose a sentence above the statutory maximum" and that "the death penalty is within the statutory range of punishment prescribed for first degree murder by the Tennessee General Assembly...." *Holton,* 126 S.W.3d at 863 (citing *State v. Dellinger,* 79 S.W.3d 458, 466–67 (Tenn.2002)). We also emphasized that Tennessee's capital sentencing procedures

require that a jury, not a judge, make the findings regarding the presence of aggravating circumstances and that the findings must be made beyond a reasonable doubt. *Holton,* 126 S.W.3d at 864; *see also* Tenn. Code Ann. § 39–13–204(f)(1) (2003).[13]

In short, we have rejected the arguments raised by the defendant, and we have clearly held that Tennessee's capital sentencing scheme does not require that aggravating circumstances be included in an indictment. The defendant's arguments are without merit.

## Conclusion

After reviewing the record and applicable authority, we now hold as follows: (1) the trial court committed reversible error by retroactively applying a 1998 amendment to Tennessee Code Annotated section 39–13–204(c) and allowing the introduction of extensive evidence regarding the facts and circumstances of the defendant's prior felonies to support the aggravating circumstance in Tennessee Code Annotated section 39–13–204(i)(2); (2) the trial court did not err in admitting photographs of the victim in this case but did err in admitting photographs of the victim of a felony offense committed in 1978 by the defendant; (3) the trial court did not err in denying the defendant's motion for continuance to complete psychiatric or neuropsychological testing; (4) the death sentence was not invalid based on the failure of the indictment to charge the aggravating circumstance; and (5) the issue of whether the death penalty was excessive, arbitrary, or disproportionate in this case under the mandatory provisions of Tennessee Code Annotated section 39–13–206(c)(1)(A)(D) need not be addressed at this time. We agree with the Court of Criminal Appeals' conclusions with respect to the remaining issues and have included the relevant portions of that opinion in the appendix to this opinion. Accordingly, we reverse the judgment of the Court of Criminal Appeals and remand the case to the trial court for re-sentencing. Costs of the appeal are taxed to the State of Tennessee.

WILLIAM M. BARKER, J., dissents.

## *APPENDIX*

(Excerpts from the Court of Criminal Appeals' Decision)

### IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

### AT JACKSON

March 12, 2002 Session

**STATE OF TENNESSEE v. RICHARD ODOM, a/k/a OTIS SMITH**

**Direct Appeal from the Criminal Court for Shelby County**

**No. 91–07049 Chris Craft, Judge**

**No. W2000–02301–CCA–R3–DD— Filed October 15, 2002**

[Deleted: Introductory Paragraph]

**Tenn. R.App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

Robert C. Brooks (at trial and on appeal) and Edward Chandler (at trial), Memphis,

---

**13.** We have also observed that district attorneys are required to notify a defendant of their intent to seek the death penalty no less than thirty days before trial pursuant to Rule 12.3(b) of the Tennessee Rules of Criminal Procedure and that this notice satisfies the requirements of due process. *State v. Dellinger,* 79 S.W.3d at 467.

Tennessee, for the appellant, Richard Odom.

Paul G. Summers, Attorney General and Reporter; Mark E. Davidson, Assistant Attorney General; William L. Gibbons, District Attorney General; and Phillip Gerald Harris and Amy Weirich, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### [Deleted: Procedural History, Facts, and Testimony]

### [Deleted: I. Failure of Indictment of Allege Capital Offense]

### [Deleted: II. Denial of Continuance to Complete Psychiatric and Neuropsychological Testing, except for Trial Court Order of October 12, 1999]

This cause came on to be heard on the various *ex parte* motions filed by defendant, and the record as a whole,

FROM ALL OF WHICH THE COURT FINDS that defendant's case was remanded back to this Court for resentencing after the State's petition to rehear was denied October, 1996, and was set for resentencing on January 27, 1997, by agreement of all parties. On December 20, 1996, this Court granted a continuance at the request of the state, the defendant's attorneys, and the defendant, acting *pro se*, and because a conflict of interest had arisen between defendant and the Office of the Public Defender. The circumstances of this conflict are set out in this Court's order entered June 4, 1997, continuing the resentencing hearing, relieving his former attorneys of representation and appointing his present attorneys, Robert Brooks and Ed Chandler. Not set out in that order, as the matter was heard

*ex parte,* was the request of defendant's assistant public defenders that they needed a continuance because they had not had time to find an expert who would testify in mitigation concerning the defendant's mental condition. Filed in the original court jacket of this case is a report by the Mississippi State Hospital of the results of their evaluation of defendant in 1978 that "It was the unanimous opinion of the professional staff of the forensic unit that Mr. Odom was without psychosis, responsible and competent to stand trial[.]" ... Dr. John Hutson had also been privately hired by the Public Defender's Office to examine the defendant for purposes of mitigation in his original trial, and although this Court has not been made privy to the report of his examination, he did testify in defendant's first sentencing hearing that he examined the defendant May 19th, 1991, May 31, 1991, December 30, 1991, April 10, 1992, and during defendant's original trial. Although the trial judge in that first trial committed reversible error in not allowing Dr. Hutson to testify to defendant's social history, the defense never attempted to ask him about any mental problems he might have found in his examination of the defendant. He read from his findings from his examination on cross-examination, however, that

> In regards to his sanity at the time of his alleged offense Mr. Odom has never been diagnosed with any significant psychiatric disorder, such as would be likely to impair his ability to appreciate the wrongfulness of his actions, or to impair his ability to conform his behavior to the requirements of the law. He likely can be diagnosed as a personality disorder, but that is not particularly relevant to his defense. Furthermore, his description of his behavior just prior to and at the time

of his alleged actions on or about 10 May, 1991, although indicative of some desperation with regard to finding food and shelter, does not indicate any significant impairment of his abilities. ... He had also indicated in his evaluation and report that there "appears to be a paucity of mitigating circumstances." On remand, defendant's resentencing attorneys therefore asked this Court in chambers to grant them funds to hire another expert, which this Court stated would be granted when the expert was chosen, and a proper motion and affidavit were filed. This expert had not been found by the December 20, 1996, motion hearing, and was an additional reason this Court granted the continuance of the January 27, 1997 resentencing hearing, as the defense needed additional time.

After new attorneys were appointed in the above-mentioned June 4, 1997 order, defendant filed on August 1, 1997, a "Motion to Set Resentencing," suggesting a resentencing date of December 1997 or January 1998, to give the attorneys several months to "conduct such further investigation as is necessary and to adequately prepare for the defendant's resentencing proceeding," which was granted. Due to the failure of the defendant to return from the State of Mississippi because of repeated resets of his murder retrial in that state, this Court was compelled to reset defendant's Tennessee retrial, and set a status report date of November 3, 1997, and then February 6, 1998.

In January and February of 1998, defendant filed *ex parte* motions for a mitigation specialist, a psychologist, a "jury selection and trial consultant," and a research assistant for a motion for change of venue. This Court granted the motion as to the mitigation specialist, Gloria Shettles, and entered a written order to that effect June 29, 1998. The motion for the jury consultant/research assistant was denied, as there was no showing of particularized need. *State v. Black*, 815 S.W.2d 166, 179–80 (Tenn.1991). This Court also felt there would be no problem with pretrial publicity. In the pretrial jury questionnaire and individual voir dire on pretrial publicity administered at the resentencing hearing, only one juror, a television news reporter, was exposed to any prejudicial pretrial publicity, and she was excused for cause.

The motion for a psychologist stated that "Counsel has recently learned of possible indications in the defendant's behavior of an intermittent explosive disorder" due to a prison guard's telling counsel that the defendant had a violent temper. It was also supported by an affidavit from Dr. John Hutson, defendant's original psychologist, who referenced the 1978 Mississippi exam and his own exam of defendant in 1991, and stated he felt a new exam was warranted, as 7 years had passed since the original trial. He did not, however, note any finding at any time of any new mental problems possessed by the defendant. This Court told defendant's attorneys the motion would be granted once a psychologist was chosen and the proper motion and affidavits were filed. Between further status dates of February 27, 1998, March 26, 1998, May 29, 1998, and August 28, 1998, this Court received nothing from defendant requesting any funds for any mental health experts or examinations. Defendant was again convicted of the 1978 murder in Mississippi in July of 1998. This Court, on August 28, 1998, set an additional status report date for November 30, 1998, giving defendant an additional four months to complete any

investigation necessitated by the Mississippi murder retrial and conviction, which the state was using as an aggravating circumstance. During this additional four month delay nothing was heard from defendant's attorneys *ex parte* regarding funds for a psychologist. On November 30, 1998 the resentencing hearing was then set for retrial May 10, 1999, by agreement of all parties, giving defendant more than 5 additional months to complete any needed mitigation investigation. Motions were heard February 26, 1999, and this Court allowed *ex parte* funds that same day for copies of pleadings from two other capital cases recently tried. No mention was made during these discussions of a need for a psychologist, and this Court assumed that since 10 months had passed since the *ex parte* request for a psychologist, the defense was not going to proceed with a mental defense, given the lack of any support for one in the pleadings and record before this Court.

On March 2, 1999, a "Motion for Continuance of Jury Trial Set May 10, 1999," was filed by the defendant. An additional "Motion to Continue Motion Hearing and Jury Trial" was filed March 25, 1999, by the defendant. At the hearing on these two motions for continuance, defendant's attorneys revealed in open court that their mitigation expert, Gloria Shettles, for which this Court had allowed funds *ex parte*, had not completed the mitigation investigation, and that the attorneys had just recently discovered this fact, and could not be ready for trial May 10th. The State, understandably aggrieved, objected to the continuance and asked this Court to order the defendant to reveal the nature of the mitigation proof so that the State would not be handicapped in opposing the motions for continuance.

This Court denied this request, granting over the State's strenuous objection the motions to continue, resetting the resentencing hearing for September 27, 1999, to give the defense more than five additional months to prepare.

After the continuance was granted, another *ex parte* motion for a psychiatrist was filed April 23, 1999, requesting Dr. Kenner, a Nashville expert, and a supplemental motion requested a spinal tap of the defendant and a serotonin study by Dr. Rossby, also from Nashville. These were both granted in orders entered by this Court on April 27, 1999, approved by Chief Justice Riley Anderson, and returned to this Court June 15, 1999. Also approved were additional funds for Gloria Shettles. Other motions were filed and heard May 28, 1999. This Court also approved in *ex parte* hearings a spinal tap of the defendant on July 15, 1999, an Order for Jail Records on August 6, 1999, funds for a transcript of the Mississippi trial on August 30, 1999, and funds for a glucose tolerance test on September 16, 1999.

On August 10, 1999, another motion for continuance was filed by the defendant, stating that a mitigation witness (later found to be Gloria Shettles) had a conflict with the September 27th date. In discussing a hearing date on the motion in court with Mr. Brooks, he informed me that only a one week continuance would be requested, and I asked him to get with Mr. Harris (one of the prosecutors) and agree on a date to hear the motion as soon as possible. This motion was then withdrawn by defendant off the record, during a conversation between Mr. Brooks and Mr. Harris, in which Mr. Brooks told Mr. Harris to inform me that the motion would be withdrawn and would not need a hearing date, as the witness conflict had been

resolved. This Court was so informed, and this motion is hereby shown withdrawn. No mention was ever made at any time during these discussions that the defense might not otherwise be ready for trial.

Mr. Brooks next came to see me in chambers on September 14, 1999, less than two weeks before trial date, with an *ex parte* written request for expert services to be performed beginning November 1, 1999, which stated that "Dr. Kenner has requested that a neuro-psychological evaluation of the defendant be performed by Dr. Pamela Auble ... in order that he may complete his evaluation." This request was being made almost five months after the order was entered for funds for Dr. Kenner, and three months after receipt of those approved orders from the Supreme Court. I denied that request, stating that there could be no specialized need for services performed November 1st, as that would be after the resentencing hearing, which was to begin September 27th. Defendant then filed another Motion for Continuance on September 16, 1999, which was heard that same day, and denied. This Court finds that defendant's attorneys have been given more than enough time to prepare a mitigation defense. Although the delay of the resentencing from the first setting of January 27, 1997, was in part caused by the defendant's being in Mississippi, there is absolutely no excuse for the mitigation investigation not to have been completed during this period of time, prior to November 30, 1998. The defendant had different attorneys appointed to represent him in Mississippi, and that trial in no way prevented his present attorneys from their trial preparation of his Tennessee resentencing hearing. After defendant's conviction in Mississippi in July, 1998, he was returned to Tennes-

see, and had an additional 4 months to prepare for his status report date of November 30, 1998. After November 30th, he was granted an additional 5 months to prepare before his resentencing hearing, set May 10, 1999. Because this Court felt constitutionally compelled to grant yet another continuance of the May 10 resentencing hearing, as the attorneys admitted on the record their mitigation investigation was still not complete, this Court gave them an additional 5 months from the granting of the continuance until the new date of September 27, 1999. This period of time is much more than sufficient to have prepared any mitigation defense, no matter how involved, intricate or complex.

This Court also considered the nature of the expert services requested, a neuro-psychological exam, and felt that defendant could have those services performed prior to September 27th by someone else. The day after the September 16th motion for continuance was denied, this Court in fact entered an *ex parte* order at the request of the defense authorizing the neuro-psychological evaluation, to be performed immediately by a Dr. Alison Kirk in Nashville.

On September 22, 1999, the defendant filed yet another motion to continue, *ex parte*, which stated that after Dr. Kirk talked to Dr. Kenner, she changed her mind about performing the evaluation. This motion was supported by an affidavit from Dr. Kenner that stated that unless this evaluation were done (presumably by Dr. Auble) he could not in good conscience continue his work on defendant's case. This motion was argued in open court, as this Court cannot hear motions to continue *ex parte*, with the State being present, but not being allowed to see the motion. This Court denied that motion, for the reasons stat-

ed on the record at the time, stating also that the Court would enter this order additionally setting out *ex parte* reasons. There is still nothing on the record that would support any mental illness or defect possessed by the defendant which could be used in mitigation, and the nature of the additional services requested, for which the continuance was sought, are merely exploratory in nature. Although the defense desires that these services be performed, a showing of particularized need for funds for these services has not been shown, and they are not so material to mitigation that "the failure to grant a continuance denied defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted." *State v. Hines*, 919 S.W.2d 573, 579 (Tenn.1995).

On September 23rd, 1999, another *ex parte* motion was filed, seeking this Court to authorize additional funds for Dr. Kenner to travel to Memphis to testify, supported by an affidavit from Dr. Kenner signed September 21st, which shows 2½ hours of examination of the defendant and 7½ hours review of records, and a bill for $2,000. He asked for an additional $10,000 limit to travel to Memphis and testify, although stating no conclusions that he found anything concerning the defendant's mental state the defendant could use in mitigation. This Court, in deference to the right of the defendant to put on mitigation, authorized the funds.

On the day of trial, the defense informed this Court in open court that Dr. Kenner was refusing to come to Memphis to testify, because this Court would not allow a continuance so that Dr. Auble could perform additional tests. This Court, feeling that it should not allow the Criminal Justice System to be held hostage by a psychiatrist, offered to compel the attendance of Dr. Kenner, which offer was declined by the defense, presumably because Dr. Kenner would have had nothing to offer. The *ex parte* order previously entered on April 27, 1999, authorizing funds for Dr. Kenner is therefore rescinded, and it is hereby ordered that Dr. Kenner not be reimbursed by the Administrative Office of the Courts for any services performed by him in connection with this case, due to his willful refusal to testify in defendant's resentencing hearing.

This Court has done everything in its power to allow the defendant to produce every bit of proof he could muster in his resentencing, allowing . many continuances over a period of two years and eight months from the first resentencing hearing set January 27, 1997, and has allowed funds for numerous experts whenever requested. The defendant had a fair trial and presented an effective, although not victorious, defense. To have permitted yet another continuance to allow the defendant to conduct last minute exploratory examinations, for which no basis had been shown in the record, at the last minute whim of a petulant expert witness, would have been in this Court's opinion extremely improper, and would be a gross abuse of the judicial process.

**[Deleted: III. Sentencing Pursuant to Statute in Effect at Time of Offense]**

**[Deleted: IV. Introduction of Photographs of Homicide Victims]**

## V. Denial of Defendant's Motion to Allow Jury to Return Sentence of Life Without Parole

In 1993, the General Assembly amended the capital sentencing statutes to provide

for the sentence of life imprisonment without the possibility of parole. *State v. Keen,* 31 S.W.3d 196, 213 (Tenn.2000) (citing 1993 Tenn. Pub. Acts ch. 473), *cert. denied,* 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001). Prior to 1993, the only punishments available for a person convicted of first degree murder were life imprisonment and death. *See id.; State v. Cauthern,* 967 S.W.2d 726, 735 (Tenn.), *cert. denied,* 525 U.S. 967, 119 S.Ct. 414, 142 L.Ed.2d 336 (1998). In *Keen,* our supreme court held that neither the state nor federal constitution required that a jury be allowed to consider life without parole for offenses committed prior to July 1, 1993. 31 S.W.3d at 217 n. 7.

The defendant's offense was committed in 1991, over two years before the passage of the 1993 Act, and his resentencing hearing was conducted six years after the Act's effective date. He asserts that he was constitutionally entitled to have the jury provided the option of imposing a sentence of life without the possibility of parole, and that the legislature's action in limiting the application of the 1993 Act to crimes committed on or after July 1, 1993, violates both federal and state constitutions. However, the defendant acknowledges that these arguments have been rejected by our supreme court in *Keen,* 31 S.W.3d at 213–19. Since this court is bound by the precedent established by our supreme court, we find it unnecessary to review the propriety of its holdings. This claim is without merit.

## VI. Death Penalty Violates United States Treaties and International Law

The defendant asserts on appeal that Tennessee's imposition of the death penalty violates the following treaties of the United States: the International Covenant on Civil and Political Rights; the International Convention on the Elimination of All Forms of Racial Discrimination; and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. By his argument, the disregard of these treaties violated the Supremacy Clause of the United States Constitution. These claims are based upon two primary grounds: (1) customary international law and specific international treaties prohibit capital punishment; and (2) customary international law and specific international treaties prohibit reinstatement of the death penalty once it has been abolished. In his reply brief, the defendant presents the additional claim that the State's response, that the United States became a party to these treaties "with reservations" that capital punishment still could be imposed, is without merit because the United States Constitution does not permit such reservations.

Initially, we note that the defendant has cited no decision of any court accepting his arguments that, because of treaty obligations of the United States, the death penalty cannot be imposed in this country. In fact, the Sixth Circuit Court of Appeals, in *Buell v. Mitchell,* 274 F.3d 337 (6th Cir.2001), dismissed similar claims that the Ohio death penalty scheme violated both international laws and treaties. In *Buell,* as in the present case, the defendant argued that Ohio's death penalty statute violated the Supremacy Clause by not complying with (1) the American Declaration of the Rights and Duties of Men and (2) the International Covenant on Civil and Political Rights and that "the prohibition of executions is not only a customary norm of international law, but rather, a peremptory norm of international law, or *jus cogens,* that is accepted and recognized by the international community and that can-

not be derogated." *Id.* at 370 (citations omitted).

The court rejected the defendant's contention that "the abolition of the death penalty has been accepted by international agreement and as a form of customary law," *id.* at 371, finding (1) to the extent that the agreements relied upon by the defendant ban cruel and unusual punishment, the United States had included express reservations preserving the right to impose the death penalty within the limits of the United States Constitution, and (2) the agreements were not binding on courts of the United States. *Id.* at 372. In so holding, the court reasoned:

> These agreements [the American Declaration of the Rights and Duties of Men and the International Covenant on Civil and Political Rights] do not prohibit the death penalty.... Moreover, the United States has approved each agreement with reservations that preserve the power of each of the several states and of the United States, under the Constitution.
>
> Neither the OAS Charter [Charter of the Organization of American States] nor the American Declaration specifically prohibit capital punishment. *See State v. Phillips,* 74 Ohio St.3d 72, 656 N.E.2d 643, 671 (1995). Furthermore, the United States Senate approved the OAS Charter with the reservation that " 'none of its provisions shall be considered as ... limiting the powers of the several states ... with respect to any matters recognized under the Constitution as being within the reserved powers of the several states.' " Charter of the Organization of American States, 1951, 2 U.S.T. 2394, 2484.
>
> The International Covenant ... does not require its member countries to abolish the death penalty. Article 7 of

the International Covenant prohibits cruel, inhumane, or degrading punishment.... The United States agreed to abide by this prohibition only to the extent that the Fifth, Eighth, and Fourteenth Amendments ban cruel and unusual punishments. *See* 138 Cong. Rec. S–4781–01, S4783 (1992) ("That the United States considers itself bound by article 7 to the extent that 'cruel, inhuman or degrading treatment or punishment' means the cruel and unusual treatment or punishment prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the Constitution of the United States."); *see also Jamison v. Collins,* 100 F.Supp.2d 647, 766 (S.D.Ohio 2000) (citing Christy A. Short, Comment, *The Abolition of the Death Penalty,* 6 Ind. J. Global Legal Stud. 721, 725–26, 730 (1999)).

> Moreover, the International Covenant specifically recognizes the existence of the death penalty....

> Finally, we note that even if the agreements were to ban the imposition of the death penalty, neither is binding on federal courts. "Courts in the United States are bound to give effect to international law and to international agreements, except that a 'non-self-executing' agreement will not be given effect as law in the absence of necessary authority." Restatement (Third) of Foreign Relations Law § 111 (1987). Neither the American Declaration nor the International Covenant is self-executing, nor has Congress enacted implementing legislation for either agreement. *See Garza v. Lappin,* 253 F.3d 918, 923 (7th Cir.2001) (stating that the "American Declaration ... is an aspirational document which ... did not on its own create any enforceable obligations on the part of any of the OAS member nations"); *Beazley v. Johnson,* 242 F.3d

248, 267–68 (5th Cir.2001) (citing cases and other sources indicating that the International Covenant is not self-executing); *Hawkins [v. Comparet–Cassani]*, 33 F.Supp.2d [1244] at 1257 [ (C.D.Cal.1999) ] (noting that Congress has not enacted implementing legislation for the International Covenant).

*Buell,* 274 F.3d at 371–72.

As in the present case, the defendant in *Buell* also asserted that Ohio's death penalty violated customary international law. The Sixth Circuit rejected this argument as well:

The prohibition of the death penalty is not so extensive and virtually uniform among the nations of the world that it is a customary international norm. This is confirmed by the fact that large numbers of countries in the world retain the death penalty. Indeed, it is impossible to conclude that the international community as a whole recognizes the prohibition of the death penalty, when as of 2001, 147 states were parties to the International Covenant, which specifically recognizes the existence of the death penalty.

*Id.* at 373 (citations omitted).

The court additionally advised:

We believe that in the context of this case, where customary international law is being used as a defense against an otherwise constitutional action, the reaction to any violation of customary international law is a domestic question that must be answered by the executive and legislative branches. We hold that the determination of whether customary international law prevents a State from carrying out the death penalty, when the State otherwise is acting in full compliance with the Constitution, is a question that is reserved to the executive and legislative branches of the United States government, as it [is] their constitutional role to determine the extent of this country's international obligations and how best to carry them out.

*Id.* at 375–76 (footnote omitted).

The authorities appear to be universal that no customary or international law or international treaty prohibits a state from imposing the death penalty as a punishment for certain crimes. *See Stanford v. Kentucky,* 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989); *United States v. Duarte–Acero,* 296 F.3d 1277, 1283 (11th Cir.2002) (International Covenant on Civil and Political Rights not binding on the federal courts because it is not self-executing and Congress has not passed legislation implementing it); *Buell v. Mitchell,* 274 F.3d 337 (6th Cir.2001); *United Mexican States v. Woods,* 126 F.3d 1220, 1223 (9th Cir.1997); *Faulder v. Johnson,* 99 F.Supp.2d 774, 777 (S.D.Tex.1999) (In signing Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment and International Covenant on Civil and Political Rights, United States made reservation stating that it understood language to mean cruel and unusual punishment as defined by the Eighth Amendment, which does not prohibit the death penalty.); *Workman v. Sundquist,* 135 F.Supp.2d 871 (M.D.Tenn. 2001); *Jamison v. Collins,* 100 F.Supp.2d 647, 766 (S.D.Ohio 2000); *People v. Ghent,* 43 Cal.3d 739, 239 Cal.Rptr. 82, 739 P.2d 1250 (1987); *State v. Kleypas,* 272 Kan. 894, 40 P.3d 139 (2001), *cert. denied,* 537 U.S. 834, 123 S.Ct. 144, 154 L.Ed.2d 53 (2002); *Domingues v. State,* 114 Nev. 783, 961 P.2d 1279 (1998); *State v. Nelson,* 155 N.J. 487, 715 A.2d 281 (1998); *State v. Phillips,* 74 Ohio St.3d 72, 656 N.E.2d 643, 671 (1995); *Hinojosa v. State,* 4 S.W.3d 240, 252 (Tex.Crim.App.1999).

 

In his reply brief, the defendant presents the additional argument that the United States Senate cannot approve a treaty "with reservations." As he states, "[i]t has been assumed, without analysis under the separation of powers doctrine, that the Senate has the right to place conditions and reservations on the provisions of a treaty to which it gives its 'consent' under the Treaty Clause." He then cites three decisions of the United States Supreme Court which, by his interpretation, compel this result. We have carefully reviewed these authorities, *Clinton v. City of New York*, 524 U.S. 417, 438, 118 S.Ct. 2091, 2103, 141 L.Ed.2d 393, 414 (1998) (line item veto held invalid because the Constitution does not authorize the President "to enact, to amend, or to repeal statutes"); *Bowsher v. Synar*, 478 U.S. 714, 736, 106 S.Ct. 3181, 3193, 92 L.Ed.2d 583, 603 (1986) ("[T]he powers vested in the Comptroller General under § 251 [of the balanced budget and Deficit Control Act of 1985] violate the command of the Constitution that the Congress play no direct role in the execution of the laws."); and *INS v. Chadha*, 462 U.S. 919, 954–55, 103 S.Ct. 2764, 2785–86, 77 L.Ed.2d 317, 346–47 (1983) (congressional veto provision in section 244(c)(2) of the Immigration and Nationality Act, allowing one house of Congress to invalidate a decision of the Executive Branch, determined to be unconstitutional). While these three decisions all deal with separation of power issues, we respectfully disagree with the defendant's assertions that their rationales compel the conclusion that the United States Senate cannot approve a treaty "with reservations." In fact, a determination that the Senate can do so is implicit in the numerous other decisions considering defendants' treaty-based attacks on the

imposition of capital punishment. *See Coleman v. Mitchell*, 268 F.3d 417, 443 n. 12 (6th Cir.2001), *cert. denied*, 535 U.S. 1031, 122 S.Ct. 1639, 152 L.Ed.2d 647 (2002) (" '[T]he United States is not party to any treaty that prohibits capital punishment per se.' ") (quoting *United States v. Bin Laden*, 126 F.Supp.2d 290, 294 (S.D.N.Y.2001)). Thus, we respectfully disagree that the authorities cited by the defendant support his claim that the Treaty Clause of the United States Constitution prevents the Senate from approving a treaty with reservations.

Accordingly, we conclude that this assignment is without merit.

## VII. Constitutionality of Tennessee Death Penalty Statutes

The defendant raises numerous challenges to the constitutionality of Tennessee's death penalty provisions. Included within his challenge that the Tennessee death penalty statutes violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, and Article I, Sections 8, 9, 16, and 17, Article II, Section 2, and Article XI, Section 8, of the Tennessee Constitution are the following:

**A. Tennessee's death penalty statutes fail to meaningfully narrow the class of death eligible defendants; specifically, the statutory aggravating circumstances set forth in Tennessee Code Annotated section 39–13–204(i)(2), (i)(5), (i)(6), and (i)(7) have been so broadly interpreted, whether viewed singly or collectively, that they fail to provide such a "meaningful basis" for narrowing the population of those convicted of first degree murder to those eligible for the sentence of death.[1]**

---

**1.** We note that factors (i)(5), (i)(6), and (i)(7) do not pertain to this case as they were not

relied upon by the State. Thus, any individual claim with respect to these factors is with-

As to this claim, the defendant asserts in his brief that our supreme court ruled incorrectly in *State v. Caldwell,* 671 S.W.2d 459 (Tenn.1984), and *State v. Blouvett,* 904 S.W.2d 111 (Tenn.1995), arguing that application of these holdings results in an overbroad construction of Tennessee Code Annotated section 39–13–204(i)(2) and violates his right to substantive due process. Thus, he invites this court to reconsider these decisions. However, this court, being inferior to our supreme court, is bound by its decisions and must abide with its "order, decrees and precedents." *State v. Irick,* 906 S.W.2d 440, 443 (Tenn.1995). Applying the holdings of our supreme court in *Caldwell* and *Blouvett,* we conclude that this assignment is without merit.

**B. The death sentence is imposed capriciously and arbitrarily in that:**

**(1) unlimited discretion is vested in the prosecutor as to whether or not to seek the death penalty, and**

**(2) it is imposed in a discriminatory manner based upon economics, race, geography, and gender.**

These arguments have been rejected on numerous occasions by our supreme court. *See State v. McKinney,* 74 S.W.3d 291, 319 (Tenn.), *cert. denied,* 537 U.S. 926, 123 S.Ct. 321, 154 L.Ed.2d 219 (2002).

**(3) there are no uniform standards or procedures for jury selection to insure open inquiry concerning potentially prejudicial subject matter.**

This argument has been rejected by our supreme court. *See State v. Caughron,* 855 S.W.2d 526, 542 (Tenn.), *cert. denied,* 510 U.S. 979, 114 S.Ct. 475, 126 L.Ed.2d 426 (1993).

out merit. *See, e.g., State v. Hall,* 958 S.W.2d 679, 715 (Tenn.1997); *State v. Brimmer,* 876 S.W.2d 75, 87 (Tenn.1994).

**(4) the death qualification process skews the make-up of the jury and results in a relatively prosecution-prone guilt-prone jury.**

This argument, likewise, has been rejected. *See State v. Teel,* 793 S.W.2d 236, 246 (Tenn.), *cert. denied,* 498 U.S. 1007, 111 S.Ct. 571, 112 L.Ed.2d 577 (1990); *State v. Harbison,* 704 S.W.2d 314, 318 (Tenn.), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2261, 90 L.Ed.2d 705 (1986).

**(5) defendants are prohibited from addressing jurors' popular misconceptions about matters relevant to sentencing, i.e., the cost of incarceration versus cost of execution, deterrence, method of execution, and parole eligibility.**

This argument has been rejected by our supreme court. *See Terry v. State,* 46 S.W.3d 147, 170 (Tenn.), *cert. denied,* 534 U.S. 1023, 122 S.Ct. 553, 151 L.Ed.2d 428 (2001); *Brimmer,* 876 S.W.2d at 86–87; *State v. Cazes,* 875 S.W.2d 253, 268 (Tenn. 1994); *State v. Black,* 815 S.W.2d 166, 179 (Tenn.1991).

**(6) the jury is instructed that it must agree unanimously in order to impose a life sentence, and is prohibited from being told the effect of a nonunanimous verdict.**

This argument has been rejected by our supreme court. *See Terry,* 46 S.W.3d at 170; *Brimmer,* 876 S.W.2d at 87; *Cazes,* 875 S.W.2d at 268; *State v. Smith,* 857 S.W.2d 1, 22–23 (Tenn.1993).

**(7) requiring the jury to agree unanimously to a life verdict violates *Mills v. Maryland*[2] and *McKoy v. North Carolina*.[3]**

**2.** 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

**3.** 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990).

This argument has been rejected by our supreme court. *See Brimmer*, 876 S.W.2d at 87; *State v. Thompson*, 768 S.W.2d 239, 250 (Tenn.1989); *State v. King*, 718 S.W.2d 241, 249 (Tenn.1986), *superseded by statute as recognized by State v. Hutchison*, 898 S.W.2d 161 (Tenn.1994).

**(8) there is a reasonable likelihood that jurors believe they must unanimously agree as to the existence of mitigating circumstances because of the failure to instruct the jury on the meaning and function of mitigating circumstances.**

This argument has been rejected. *See State v. Keen*, 31 S.W.3d 196, 233 (Tenn. 2000), *cert. denied*, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001); *Thompson*, 768 S.W.2d at 251–52.

**(9) the jury is not required to make the ultimate determination that death is the appropriate penalty.**

This argument has been rejected by our supreme court. *See Brimmer*, 876 S.W.2d at 87; *Smith*, 857 S.W.2d at 22.

**(10) the defendant is denied final closing argument in the penalty phase of the trial.**

This argument has been rejected. *See Brimmer*, 876 S.W.2d at 87; *Cazes*, 875 S.W.2d at 269; *Smith*, 857 S.W.2d at 24; *Caughron*, 855 S.W.2d at 542.

**(11) permitting a capital defendant to waive introduction of mitigation evidence without permitting such evidence to be placed in the record for purposes of proportionality review renders the Tennessee death penalty statutes unconstitutional.**

Since the defendant presented mitigating evidence during the penalty phase, this claim appears to be irrelevant to his appeal. The Supreme Court of the United States does not require a defendant to present mitigating evidence; rather, statements by the Court regarding the ability of a defendant to present such evidence are phrased permissively. *See, e.g., Blystone v. Pennsylvania*, 494 U.S. 299, 307 n. 5, 110 S.Ct. 1078, 1083, n. 5, 108 L.Ed.2d 255 (1990); *McCleskey v. Kemp*, 481 U.S. 279, 305–06, 107 S.Ct. 1756, 1774–75, 95 L.Ed.2d 262 (1987); *Skipper v. South Carolina*, 476 U.S. 1, 8, 106 S.Ct. 1669, 1672–73, 90 L.Ed.2d 1 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 113–14, 102 S.Ct. 869, 876–77, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978). Further, the Eighth Amendment and evolving standards of decency neither require nor demand that an unwilling defendant present an affirmative penalty defense in a capital case. *See State v. Smith*, 993 S.W.2d 6, 13–14 (Tenn.1999).

This assignment is irrelevant to the defendant's case but, even if it were relevant, it is without merit.

**(12) mandatory introduction of victim impact evidence and of other crime evidence upon prosecutor's request violates separation of powers and injects arbitrariness and capriciousness into capital sentencing.**

Tennessee Code Annotated section 39–13–204(c) provides that a trial court "shall" permit a victim's representative to testify before the jury in sentencing, and the defendant asserts that "[t]his legislation improperly infringes upon a trial court's power to conduct proceedings and is thus a violation of separation of powers." Additionally, he argues that the legislative mandate and the supreme court's decision in *State v. Nesbit*, 978 S.W.2d 872 (Tenn. 1998), "render death sentencing in Tennessee unconstitutional since this factor is rife with discrimination and violates equal protection guarantees of the state and federal constitutions."

Initially, as to the defendant's criticism of our supreme court's holding in *Nesbit,* we respectfully decline to review this decision because, being an intermediate court, we are without authority to overturn it, as the defendant apparently invites us to do. However, we will review the defendant's complaint as to the language in Tennessee Code Annotated section 39–13–204(c), permitting testimony at the sentencing hearing "about the impact of the murder on the family of the victim and other relevant persons."

As our supreme court explained in *State v. McKinney,* 74 S.W.3d 291 (Tenn.2002), neither the United States nor the Tennessee Constitution precludes the introduction of "victim impact" evidence:

> The introduction of "victim impact" evidence and prosecutorial argument is not precluded by either the United States Constitution or the Tennessee Constitution in a capital sentencing proceeding. *See Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991); *State v. Nesbit,* 978 S.W.2d 872, 889 (Tenn.1998). As the United States Supreme Court has explained:
>
> > We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. "[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, *so too the victim is an individual whose death represents a unique loss*

> > *to society and in particular to his family."*
>
> *Id.* at 308–09 (quoting *Payne v. Tennessee,* 501 U.S. at 825, 111 S.Ct. at 2608 (alteration in original) (emphasis added)).

Thus, it is clear that this statute does not make admissible that which, otherwise, would be proscribed.

We now will review the defendant's claim that this statute violates the separation of powers. Initially, we note that the defendant has provided no legal authorities in support of this proposition.

In *State v. Mallard,* 40 S.W.3d 473, 481 (Tenn.2001), our supreme court discussed the roles of the General Assembly and the court regarding rules of evidence and procedure to be employed in court proceedings, recognizing that circumstances arise where it is impossible to perfectly preserve the " 'theoretical lines of demarcation between the executive, legislative and judicial branches of government.' " *Id.* (quoting *Petition of Burson,* 909 S.W.2d 768, 774 (Tenn.1995)). Noting the interdependency of the three branches of government, the court acknowledged the "broad power of the General Assembly to establish rules of evidence in furtherance of its ability to enact substantive law." *Id.* (citing *Daugherty v. State,* 216 Tenn. 666, 393 S.W.2d 739, 743 (1965)). However, the legislature's enactment of rules for use in the courts of this state is confined to those areas that are appropriate to the exercise of that power. *Id.* Additionally, the court acknowledged the judiciary's acceptance of procedural or evidentiary rules promulgated by the General Assembly where the legislative enactments (1) are reasonable and workable within the framework already adopted by the judiciary, and (2) work to supplement the rules already promulgated by the Supreme Court. *Id.* (citing *Newton v. Cox,* 878 S.W.2d 105, 112 (Tenn.1994)). In so holding, the court

stated that "[t]his Court has long held the view that comity and cooperation among the branches of government are beneficial to all, and consistent with constitutional principles, such practices are desired and ought to be nurtured and maintained." *Id.*

As of the effective date of the amendment, our supreme court had not yet filed its decision in *Nesbit,* which was decided and released on September 28, 1998, and held that Tennessee's capital sentencing statute authorizes the admission of victim impact evidence as "one of those myriad factors encompassed within the statutory language *nature and circumstances of the crime.*" 978 S.W.2d at 890.

We interpret the legislature's action in amending Tennessee Code Annotated section 39–13–204(c) as supplementing the operation of the Rules of Evidence. The use of the word "shall" is generally mandatory, but in the present context is not inflexible. The statute does not indicate what weight should be given to the evidence nor does it indicate what sentence should be imposed. Moreover, regarding victim impact, the statute provides that the jury "may" consider said evidence. Consequently, the contested language does not impermissibly infringe upon the powers of the court.

Our conclusion is advocated by the position of our supreme court which made clear that "the rules of evidence do not limit the admissibility of evidence in a capital sentencing proceeding." *State v. Stout,* 46 S.W.3d 689, 702 (Tenn.), *cert. denied,* 534 U.S. 998, 122 S.Ct. 471, 151 L.Ed.2d 386 (2001) (citing *Van Tran v. State,* 6 S.W.3d 257, 271 (Tenn.1999)). The court interpreted section 39–13–204(c) as permitting " 'trial judges wider discretion than would normally be allowed under the Tennessee Rules of Evidence in ruling on the admissibility of evidence at a capital sentencing hearing.' " *Id.* at 703 (quoting

*State v. Sims,* 45 S.W.3d 1, 14 (Tenn. 2001)). To further explain the supreme court's acceptance of the legislature's action in this area, we restate the following principles adopted by our supreme court in *Sims:*

> The Rules of Evidence should not be applied to preclude introduction of otherwise reliable evidence that is relevant to the issue of punishment, as it relates to mitigating or aggravating circumstances, the nature and circumstances of the particular crime, or the character and background of the individual defendant. As our case history reveals, however, the discretion allowed judges and attorneys during sentencing in first degree murder cases is not unfettered. Our constitutional standards require inquiry into the reliability, relevance, value, and prejudicial effect of sentencing evidence to preserve fundamental fairness and protect the rights of both the defendant and the victim's family. The rules of evidence can in some instances be helpful guides in reaching these determinations of admissibility. Trial judges are not, however, required to adhere strictly to the rules of evidence. These rules are too restrictive and unwieldy in the arena of capital sentencing.

45 S.W.3d at 14.

Accordingly, we conclude that the 1998 amendment to Tennessee Code Annotated section 39–13–204(c) does not violate the separation of powers clauses of either the Constitution of the State of Tennessee or the Constitution of the United States of America.

This assignment is without merit.

**C. The appellate review process in death penalty cases is constitutionally inadequate.**

This argument has been rejected by our supreme court. *See Cazes,* 875 S.W.2d at 270–71; *Harris,* 839 S.W.2d at 77.

[Deleted: VIII. Review Pursuant to
Tennessee Code Annotated
section 39–13–206(c) ]

## IX. Cumulative Error

The defendant asserts that this court should not consider in isolation any errors that we deem harmless. He further argues that the cumulative effect of such errors could and did result in the violation of his right to due process. However, because we do not find multiple errors to be combined for consideration, this issue lacks merit.

[Deleted: Conclusion]

ALAN E. GLENN, JUDGE

WILLIAM M. BARKER, J., dissenting.

Because I am of the opinion that the Court of Criminal Appeals correctly held that the trial court properly permitted evidence and argument regarding the facts and circumstances of the defendant's prior violent felonies, I respectfully dissent. For the reasons given herein, I would affirm the defendant's sentence of death.

Effect of the 1998 Amendment to
Tennessee Code Annotated
section 39–13–204(c)

The threshold and fundamental issue in this case is whether the 1998 amendment to Tennessee Code Annotated section 39–13–204(c) is an ex post facto law. If it is an ex post facto law under either the United States Constitution or the Tennessee Constitution, the amended statute may not be applied retroactively. If it is not an ex post facto law, then the inquiry becomes whether there are any other reasons to prevent its retroactive application.

*Ex Post Facto Analysis*

Article 1, Section 9, Clause 3 of the United States Constitution states that "[n]o Bill of Attainder or ex post facto Law shall be passed." The Supreme Court set out its ex post facto analysis under the federal constitution in *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). The defendant in *Dobbert* was tried and convicted for first-degree murder, second-degree murder, child torture, and child abuse. Florida's death penalty statute had been changed between the time of the murder and the time of trial. Under the statute in effect at the time of the commission of the crime, the death penalty was presumed unless the jury made a recommendation of mercy, and such a recommendation was not reviewable by the trial judge. At the time of trial, the new statute provided that the jury would render an advisory decision, which would not be binding upon the judge. The trial court applied the new statute, and while the jury recommended a life sentence, the judge overruled that recommendation and sentenced the defendant to death. The Florida Supreme Court affirmed. The defendant appealed, arguing that Florida's new death penalty statute constituted an ex post facto law.

The Supreme Court held that application of the death penalty statute in effect at the time of trial was not a violation of the Ex Post Facto Clause. *Dobbert,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977) In so holding, the Court reasoned that " '[t]he crime for which the present defendant was indicted, the punishment prescribed therefor, and the quantity or the degree of proof necessary to establish guilt, all remained unaffected by the subsequent statute.' " *Id.* at 294, 97 S.Ct. 2290. (quoting *Hopt v. Utah,* 110 U.S. 574, 589–90, 4 S.Ct. 202, 28 L.Ed. 262 (1884)). "The new statute simply altered the meth-

ods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime." *Id.* at 293–94, 97 S.Ct. 2290. The Court explicitly noted that a procedural change, even though it may work to the disadvantage of a defendant, is not ex post facto. *Id.* at 293, 97 S.Ct. 2290 (citing *Thompson v. Missouri,* 171 U.S. 380, 18 S.Ct. 922, 43 L.Ed. 204 (1898) (holding that a Missouri statute authorizing for the first time the comparison of disputed handwriting with any writing provided to be genuine was not an ex post facto law); *Hopt v. Utah,* 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884) (holding that a Utah law which changed the previous rule that no convicted felon could testify in a criminal case was not an ex post facto law)).

This Court, in *Miller v. State,* 584 S.W.2d 758 (Tenn.1979), rejected the ex post facto analysis of *Dobbert* as a matter of Tennessee constitutional law, and instead adopted an older ex post facto analysis found in *State v. Rowe,* 116 N.J.L. 48, 181 A. 706, 709–10 (1935). The Tennessee Constitution states that "laws made for the punishment of acts committed previous to the existence of such laws, and by them only declared criminal, are contrary to the principles of a free Government; wherefore no Ex post facto law shall be made." Tenn. Const. art. I, § 11. *Miller* gave five situations in which a law would violate this state's constitutional prohibition against ex post facto laws.

1. A law which provides for the infliction of punishment upon a person for an act done which, when it was committed, was innocent.

2. A law which aggravates a crime or makes it greater than when it was committed.

3. A law that changes punishment or inflicts a greater punishment than the law annexed to the crime when it was committed.

4. A law that changes the rules of evidence and receives (sic) less or different testimony than was required at the time of the commission of the offense in order to convict the offender.

‎ . . . .

■ Every law which, in relation to the offense or its consequences, alters the situation of a person to his disadvantage[.]

*Miller,* 584 S.W.2d at 761 (quoting *Rowe,* 181 A. at 709–10). *See also State v. Pearson,* 858 S.W.2d 879, 881–82 (Tenn.1993) (reaffirming the holding of *Miller* ).

The defendant in *Miller,* after being found guilty of first-degree murder, was sentenced to death. He appealed his conviction on the grounds that he was tried under a statute which became effective April 11, 1977, for a crime committed on April 7, 1976, and that his capital sentence was therefore ex post facto. At the time of the commission of the crime, the legal punishment for first-degree murder was life imprisonment, as there was no constitutional procedure for the infliction of the death penalty at that time. The new statute, enacted subsequent to the crime, provided for a sentence of death following a first-degree murder conviction. This Court affirmed the murder conviction, but reduced the defendant's sentence to life imprisonment, holding that retrospective application of the new constitutional death penalty statute would violate the ex post facto prohibition of the Tennessee constitution. 584 S.W.2d at 761. The Court held that application of the five-part test precluded a sentence of death. *Id.*

Applying the five-part *Miller* test to the present case, it is clear that the 1998 amendment does not constitute an ex post facto law. (1) The amendment does not provide for the infliction of punishment

upon a person for an act done which, when it was committed, was innocent. (2) It does not aggravate a crime or make it greater than when it was committed. (3) It does not change the punishment or inflict a greater punishment than the law annexed to the crime when it was committed. (4) It does not change the rules of evidence and require less or different testimony than was required at the time of the offense in order to *convict* the offender. The defendant's conviction is not at issue in this appeal. The amendment alters the evidence that the jury is to consider when weighing the aggravator during the *sentencing* phase of the trial.

With regard to the fifth category of ex post facto laws under the *Miller* test, the 1998 amendment does not disadvantage the defendant with respect to the elements of the crime or its range of punishment. Like the four categories of ex post facto laws before it, the fifth category applies to *substantive* changes in law that impact either the crime itself or alter the punishment therefore. Our courts have emphasized the importance of distinguishing procedural changes in the law from substantive changes. This Court addressed this distinction in *State v. Pearson*:

> [I]n determining whether an ex post facto violation exists in the context of sentencing, the critical question under both the United States and Tennessee Constitutions is whether the law changes the punishment to the defendant's disadvantage, or inflicts a greater punishment than the law allowed when the offense occurred. The determination is made by comparing the standard of punishment prescribed by each statute, rather than the punishment actually imposed. Applying a law that inflicts the same or a lesser punishment raises no ex post facto concerns.

858 S.W.2d 879, 883 (Tenn.1993) (citations omitted).

Two years after *Pearson*, the Court of Criminal Appeals reiterated the rule that procedural changes in the law which do not affect a defendant's substantial rights are not ex post facto laws. *State v. Bragan*, 920 S.W.2d 227, 241 (Tenn.Crim.App.1995) (holding that retroactive application of the "[*State v.*] *Hurley* [876 S.W.2d 57 (Tenn. 1993) ] rule," which established that only a witness spouse may invoke the spousal privilege in a criminal proceeding, did not violate the constitutional prohibition against ex post facto laws because it did not take away an available defense or change the elements of the offense or the ultimate facts necessary to establish guilt). The *Bragan* court held that

> laws which change a rule of evidence, but which do not increase the punishment nor change the elements of the offense or the ultimate facts necessary to establish guilt, but only remove existing restrictions on the competency of certain classes of evidence or of persons as witnesses do not constitute ex post facto laws.

*Id.* *See also State v. Pike*, 978 S.W.2d 904, 926 (Tenn.1998) (adopting and approving in its Appendix the holding in *Bragan* ).

The *Pike* court approved that portion of the United States Supreme Court's holding in *Dobbert* that not every change of law that "may work to the disadvantage of a defendant" is an ex post facto law. *Pike*, 978 S.W.2d at 926. The prohibition of ex post facto laws is instead intended to prevent retroactive deprivation of "substantive personal rights" and does not "limit the legislative control of remedies and modes of procedure which do not affect matters of substance." *Id.* (quoting *Dobbert*, 432 U.S. at 293, 97 S.Ct. 2290). Therefore, we held that "laws which change rules of procedure but which do

not affect any substantial right of a defendant are not ex post facto laws." *Id.*

The State has argued that the amendment to Tennessee Code Annotated section 39–13–204(c) should be construed so as to apply to all cases pending at the time of the amendment. However, the majority disagrees, grounding its reasoning in essentially three points: (1) the amendment fundamentally changed the operation of the (i)(2) aggravator, amounting to a substantive change in the law; (2) statutes are always presumed to operate prospectively in the absence of legislative intent to the contrary; and (3) Tennessee Code Annotated section 39–11–112 shows that the legislature intended for the (i)(2) aggravator amendment to apply prospectively only. I disagree with each of these arguments presented by the majority, and I instead conclude that the trial court properly applied the amended statute to the defendant's re-sentencing.

With respect to the nature of the 1998 amendment, it seems that the change to the (i)(2) aggravator is not nearly so drastic as the majority presents it. Reading the amended portions of Tennessee Code Annotated section 39–13–204(c) closely, I note that the amendment does nothing other than alter the method by which the jury weighs the aggravator. The statute specifically limits the jury's consideration of this evidence to assigning weight to the aggravator.

Therefore, in my view, the 1998 amendment *does not* accomplish any of the following:

1. *The amendment does not establish new substantive elements for finding the presence of the (i)(2) aggravator.* Although the majority opinion discusses the 1998 amendments at length, no where does it mention that the (i)(2) aggravator itself was left unchanged by the 1998 amendment. This is an important point, however, as the aggravator reads exactly the same after the amendment as it did before the amendment. *See* Tenn.Code Ann. § 39–13–204(i)(2). The *only* thing that has been changed is that the jury now considers evidence of the circumstances of the prior felonies in weighing the (i)(2) aggravator vis-à-vis other aggravators and mitigators.[1]

2. *The amendment does not establish that new evidence is allowed to prove the presence of the (i)(2) aggravator beyond a reasonable doubt.* Just as the 1998 amendment does not change the elements of the (i)(2) aggravator, it likewise does not change the method of proving its existence in a particular case. Note that the amendment specifically restricts how the jury is to use the evidence: to "determin[e] the weight to be accorded the aggravating factor." Because a sentencing jury cannot weigh an aggravating circumstance until that aggravator has been proven beyond a reasonable doubt, *see* Tenn.Code Ann. § 39–13–204(g)(1), the amendment simply does not affect the proof needed to establish the aggravator's presence in any individual case.

Although one may be concerned that a jury would use the "facts and circumstances" evidence both to find and to weigh the aggravator, this concern is more properly addressed through limiting instructions and clear jury charges. The point remains, however, that this 1998 amendment is not designed to affect how

---

1. I would be much more inclined to find a substantive change if, for example, the (i)(2) aggravator itself had been amended to require proof of *two* violent felonies, or one violent *offense.* After all, these types of changes to the aggravator are truly substantive, as they "give or define the right," as opposed to merely defining the procedures used to enforce the right. *Cf. Kuykendall v. Wheeler,* 890 S.W.2d 785, 787 (Tenn.1994).

the (i)(2) aggravator is proven in the first instance. As such, the majority's conclusion that the amendment substantively changes the mechanism for proving the aggravating circumstance supposes too much.

3. *The amendment does not force, compel, or suggest that the jury reach any conclusion as to the weight of the (i)(2) aggravator.* After hearing the "facts and circumstances" evidence, a jury could find that the aggravator is entitled to very little weight, just as it could conclude that the aggravator is entitled to great weight. The 1998 amendment does not affect the mechanism of how the jury weighs the evidence, nor does it affect how much weight a jury will assign the aggravator vis-à-vis the other aggravating and mitigating circumstances. In short, I disagree with the majority opinion to the extent that it suggests that the 1998 amendment affects any substantive right of the defendant.

I believe that the facts of this case are distinguishable from those that the majority cites. For the principle that the 1998 amendment here is substantive in nature, the draft cites *State v. Bush,* 942 S.W.2d 489 (Tenn.1997) and *State v. Cauthern,* 967 S.W.2d 726 (Tenn.1998), both cases in which the Court found a substantive change in the (i)(5) aggravator. However, in those cases, the language of that aggravator itself had been changed to require proof of "serious physical abuse beyond that necessary to produce death" rather than "depravity of mind." As I mentioned above, I agree that a substantive change in an aggravator occurs when its elements are changed, and that such a change should not be applied to pending cases. I disagree however, that such a change has occurred with the (i)(2) aggravator and the 1998 amendments.

This case can be further distinguished from *State v. Cazes,* 875 S.W.2d 253 (Tenn. 1994) and *State v. Brimmer,* 876 S.W.2d 75 (Tenn.1994). In those cases, the Court was faced with a change in the standard by which the State had to prove that the aggravators outweighed the mitigators. Because the burden of proof, if not a rule of substantive law in and of itself, always affects substantive rights, it makes sense that statutes altering the burden of proof should not be applied retroactively.

In this case, however, the 1998 amendment does not change any burden of proof, just as it does not change the substantive elements of the (i)(2) aggravator. Therefore, I conclude that neither *Cazes* nor *Brimmer* necessarily compels the conclusion that the 1998 amendments here cannot be applied to all pending cases.

Likewise, *State v. Hutchison,* 898 S.W.2d 161 (Tenn.1994), is also distinguishable from this case in that *Hutchison* involved a substantive change in statutory and non-statutory mitigating circumstances.

Finally, I do not find the majority's citation of *Powers* to be particularly persuasive that the 1998 amendment is a substantive amendment. The Court's decision in *Powers* merely declared the fact "the 1998 amendment was inapplicable in this case because the offense was committed before the effective date of the amendment." It provided no analysis of why this proposition must necessarily be true, and the opinion cited only *State v. Smith,* 893 S.W.2d 908, 919 (Tenn.1994), for its holding.

Significantly, however, *Smith* involved fundamental changes to the burden of proof and the weighing of aggravating and mitigating circumstances, and the definition of the (i)(5) aggravating circumstance itself. As mentioned above, these changes are truly substantive in nature, and should

not be applied retroactively. Accordingly, because I am of the opinion that the holding of *Powers* on this point cannot withstand a close analysis and because *Smith* is clearly distinguishable, I would overrule *Powers* to the extent that it holds that the 1998 amendment may not be given retroactive application.

### Significance of the Use of the Word "Shall"

In finding a substantive change in Tennessee Code Annotated section 39–13–204(c), the majority also places emphasis on the General Assembly's use of the word "shall" as it is used in the phrases "shall be permitted" and "shall be used." Although the majority holds that this language substantively changes the (i)(2) aggravator, the majority is unclear as to precisely how this single word takes the statute "far beyond" a procedural change. Reading between the lines, however, I take the majority to mean that the word "shall" is a substantive change because it forces the trier of fact to consider details of the other offenses, whereas the jury before could not consider this evidence.

If my interpretation of the opinion is correct, then I disagree that the use of the word "shall" carries the significance attributed to it by the majority. In my mind, it seems just as plausible, if not more so, that the General Assembly's use of the word "shall" was meant only to foreclose the following two possibilities: (1) that a trial court would not allow such evidence to be heard by the jury, thereby denying the jury a real opportunity to assign weight to the aggravator; and (2) that a jury may consider this evidence for purposes other than assigning weight to the aggravator.

Consider, for example, the possibilities presented if the word "may" had been used instead of "shall." In that case, the statute would read "either party *may* be permitted to introduce evidence concerning the facts and circumstances of the prior conviction. Such evidence *may* be used by the jury in determining the weight to be accorded the aggravating factor." Under this wording, questions would naturally arise as to when a party "may not" be permitted to introduce such evidence, and for what purposes (other than the one listed) this evidence could be used by the jury. It seems logical that the General Assembly recognized this possibility and sought to eliminate these concerns before the issues tied up the courts.

Rather than fundamentally changing the operation of the (i)(2) aggravator, as the majority suggests, this wording merely seems designed to prevent these types of issues from arising in the first instance. The use of the word "shall" does not (and should not) affect whether the jury finds the presence of the (i)(2) aggravator beyond a reasonable doubt, and it does not permit the introduction of new evidence to prove the (i)(2) aggravator beyond a reasonable doubt. Accordingly, I disagree that the use of the word "shall" compels any particular conclusion that the 1998 amendment was substantive in nature and could not be applied to all pending cases.

### Prospective Statutes

With regard to the majority's argument that statutes are always presumed to operate prospectively in the absence of legislative intent to the contrary, I believe that the opinion has overstated the rule. It is true that the Court often applies an initial presumption that a statute applies prospectively only. However, this presumption is not conclusive, and this Court has recognized that an exception exists for remedial or procedural statutes, which are applied to cases pending at the time of enactment (save for constitutional concerns). *See Kee v. Shelter Ins.*, 852

S.W.2d 226, 228 (Tenn.1993) ("Generally statutes are presumed to operate prospectively and not retroactively. An exception exists, however, for statutes which are remedial or procedural in nature." (citations omitted)). Consequently, we do not state the entire rule of construction if we stop, as does the majority opinion, by stating only that a presumption of prospective application applies.

Indeed, one may suggest further that a presumption of *retroactivity* (not prospectivity) arises when the statute is procedural or remedial in nature. This is precisely the holding of *Saylors v. Riggsbee,* 544 S.W.2d 609, 610 (Tenn.1976), in which this Court stated plainly that "[r]emedial or procedural statutes apply retrospectively not only to causes of action arising before such acts become law, but to all suits pending when the legislation takes effect, *unless the legislature indicates a contrary intention or immediate application would produce an unjust result.*" (emphasis added). According to *Saylors*—and contrary to the majority opinion—a presumption of retroactive application applies to remedial and procedural statutes. In my view, the 1998 amendment is clearly procedural and it is also remedial in that it was enacted to overrule this Court's decision in *State v. Bigbee,* 885 S.W.2d 797 (Tenn.1994).

This presumption of retroactivity for procedural statutes makes sense, because were the majority's holding carried to the extreme and applied in other cases, the trial courts would be held hostage to debates over which procedural and evidentiary rules existed at the time of the offense. One may suppose that the desire to avoid these types of issues is one strong reason why we have the presumption that remedial or procedural statutes should apply to all cases pending at the time of enactment.

It is true that in the capital sentencing context, the Court has generally applied the rules in place at the time of the offense. However, at least with the cases relied upon in the majority opinion, the changes are generally substantive changes that should not be applied retrospectively. In other words, a complete application of the rules governing prospective/retroactive application of statutes does little, if any, damage to the Court's previous holdings in the capital context. I disagree with the majority's position that the "presumption of prospective application" is entitled to any great weight in the determination of this case.

### Relevance of Tennessee Code Annotated section 39–11–112

Finally, regarding the import of Tennessee Code Annotated section 39–11–112, I disagree that this statute shows that the legislature intended for the 1998 amendment to apply prospectively only. Neither *Brimmer* (upon which the majority relies) nor the majority opinion notes that the plain language of section 39–11–112 refers only to an amendment that affects "offenses" and the "prosecution" of offenses. Plainly, the capital sentencing procedures in Tennessee Code Annotated section 39–13–204 are not "offenses," and thus the more reasonable interpretation of the statute may be that it does not apply to those sentencing procedures. *See Givens v. Mullikin,* 75 S.W.3d 383, 413 (Tenn.2002) (stating that the Court "will not construe statutory language to unduly expand it beyond its plain and obvious import"). I would note that *Brimmer* does not necessarily prevent this Court from correcting its holding regarding the legislature's intent, at least when that prior holding is contrary to the statute's plain language. *See Limbaugh v. Coffee Med. Ctr.,* 59 S.W.3d 73, 81–84 (Tenn.2001) (overruling prior inter-

pretation of the GTLA that was not consistent with the statute's plain language).

In sum, I conclude that the 1998 amendment is procedural and remedial and that it does not deny the defendant a substantial right. Accordingly, the amendment is not an ex post facto law and should be given retrospective application.

## Comparative Proportionality Review

Because I, unlike the majority, find that the trial court did not err in allowing the introduction of evidence regarding the prior violent felonies, I must address the issue of proportionality of the death sentence as it applies to the defendant in this case.

Pursuant to Tennessee Code Annotated section 39–13–206(c)(1), this Court conducts a comparative proportionality review of every death sentence "for the purpose of determining whether the death penalty is unacceptable in a particular case because it is disproportionate to the punishment imposed on others convicted of the same crime." *State v. Hall*, 8 S.W.3d 593, 604 (Tenn.1999). We apply the precedent-seeking approach, in which we compare a particular case with other cases in which the defendants were convicted of the same or similar crimes. *State v. Henderson*, 24 S.W.3d 307 (Tenn.2000). We conduct this comparison by examining the facts of the crimes, the characteristics of the defendants, and the aggravating and mitigating factors involved. *See State v. Bland*, 958 S.W.2d 651, 664 (Tenn.1997).

In addition to comparing the backgrounds of the various defendants and the aggravating and mitigating factors applicable to the various cases, other factors relevant to the process of identification and comparison of similar cases include: (1) the means of death; (2) the manner of death, *e.g.*, violent or torturous; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on surviving victims. *Hall*, 8 S.W.3d at 604; *Bland*, 958 S.W.2d at 667. Also relevant when comparing the various cases are: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of the helplessness of the victim; and (8) the defendant's capacity for rehabilitation. *Hall*, 8 S.W.3d at 604–605; *Bland*, 958 S.W.2d at 667.

Applying these factors, the proof in this case reflects that the victim was a 78–year–old Caucasian female who was murdered in a parking lot as she was returning to her car. The victim was stabbed repeatedly while being raped from behind. She had multiple stab wounds to her back and side, piercing her heart, liver and lungs, as well as defensive stab wounds to her hand; she also had a torn vagina. The medical examiner testified that she suffered immediate pain and that death was not instantaneous. The apparent motivation was initially to snatch the victim's purse, however, when the victim addressed the defendant as "son," the defendant told her, "I'll give you your damn son," and proceeded to rape the victim. During the course of the rape, the victim told the defendant that she had never had sex before.

The defendant, a then thirty-year-old Caucasian male, had a history of criminal

activity including convictions for robbery and first-degree murder. He had escaped from prison where he had been serving a life sentence for murder. The defendant cooperated with the police to the extent that after initially giving the police a statement under the alias of "Otis Smith," he eventually confessed to the murder and rape. After confessing, the defendant told police that he needed help mentally and psychologically. As mitigating evidence, the defendant presented proof of his neglect and abuse as a child and his history of mental illness which included deficits in impulse and rage control.

My proportionality review reveals other cases, though not identical, that contain many circumstances that are similar to the defendant's crime and circumstances. For example, in *State v. Cazes*, 875 S.W.2d 253 (Tenn.1994), a jury imposed, and this Court upheld, a sentence of death for a defendant who murdered an elderly woman during the commission of a rape. The victim was found on the floor of her bedroom, naked and face down. She had scrape marks on her thighs and vagina, a bite mark on her breast, and evidence of penetration at or after the time of death. Death was caused by multiple blows to the head with a blunt object. The bedroom was ransacked but nothing of value was missing from the home. The jury found three aggravating circumstances: that the defendant was previously convicted of one or more violent felonies; that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; and that the murder was committed while the defendant was engaged in committing a felony. While the jury found no mitigating circumstances sufficient to outweigh the aggravating circumstances, proof was put on during the sentencing phase of trial regarding the defendant's psychological problems including chemical dependency and multiple drug abuse.

There was also evidence of impulse control deficits. The defendant stated that he was extremely drunk on the night in question and did not remember anything.

In *State v. Bush*, 942 S.W.2d 489 (Tenn. 1997), the defendant was sentenced to death for the murder of an elderly woman committed during a robbery. The victim died as a result of being stabbed forty-three times. The wounds extended down the left side of her face, down the back of her neck, across her shoulders, and down her back. Prior to being stabbed, the victim had been beaten by a stick and been knocked to the floor. The defendant, a then eighteen-year-old male known by the victim, confessed to the murder. Unlike Odom, the defendant in *Bush* did not have any significant history of prior criminal activity.

In *State v. Smith*, 893 S.W.2d 908 (Tenn. 1994), the death penalty was upheld for a defendant who murdered and raped an elderly widow during the course of a robbery. The victim was beaten over her entire body, her throat was cut twice, and she was then placed in several inches of water in the bathtub. She had also been tied up and raped. The defendant denied involvement to the police, although he admitted the killing to several acquaintances. He had a history of mental illness as well as questionable borderline mental retardation.

The Court of Criminal Appeals cited to numerous cases in which the death penalty was upheld for a murder committed during the course of a robbery. *See State v. Chalmers*, 28 S.W.3d 913 (Tenn.2000); *State v. Hall*, 8 S.W.3d 593 (Tenn.1999); *State v. Middlebrooks*, 995 S.W.2d 550 (Tenn.1999); *State v. Smith*, 993 S.W.2d 6 (Tenn.1999); *State v. Burns*, 979 S.W.2d 276 (Tenn.1998); *State v. Howell*, 868 S.W.2d 238 (Tenn.1993); *State v. Van*

*Tran,* 864 S.W.2d 465 (Tenn.1993); *State v. Harries,* 657 S.W.2d 414 (Tenn.1983); *State v. Coleman,* 619 S.W.2d 112 (Tenn. 1981). On appeal to this Court, the State cites to other similar cases, all of which involve vicious attacks on helpless, elderly victims. *See State v. Barber,* 753 S.W.2d 659 (Tenn.1988); *State v. McNish,* 727 S.W.2d 490 (Tenn.1987); *State v. Harbison,* 704 S.W.2d 314 (Tenn.1986); *State v. Cone,* 665 S.W.2d 87 (Tenn.1984); *State v. Melson,* 638 S.W.2d 342 (Tenn.1982). The defendant does not cite to or discuss any cases, but simply requests that this Court find that the sentence is disproportionate to the penalty imposed in similar cases.

The defendant in this case senselessly attacked, raped and murdered a helpless, elderly woman. He had prior convictions for violent felonies, including a conviction for first degree murder, and he was escaped from the prison sentence for the latter. When considering all of the circumstances of the present crime, as compared to the circumstances in other cases, I conclude that the death sentence was neither disproportionate nor arbitrarily applied.

### Conclusion

In summary, I agree with the trial court and the unanimous Court of Criminal Appeals that the 1998 amendment to Tennessee Code Annotated section 39–13–204(c) was properly applied to the defendant's resentencing. Because the amendment is procedural and remedial and does not substantively disadvantage the defendant, it is not an ex post facto law and should be applied retrospectively. Moreover, I conclude that the defendant's sentence of death was neither arbitrary nor dispropor-

tionate, and I would therefore affirm the Court of Criminal Appeals.